Paul WILLIAMS, Beverly Kennedy, W.B. Copeland, Trustee, Ploof Truck Lines, Inc. Profit Sharing Plan, Allan Hirschfield, Gregory Baird, individually and as Trustee of the Iva Medical Center, P.A., Pension and Profit Sharing Plan, Samuel Wegbreit, individually and on behalf of all others similarly situated, Plaintiffs,

v.

BALCOR PENSION INVESTORS, Balcor Pension Investors–II, Balcor Pension Investors–III, Balcor Pension Investors–IV, Balcor Pension Investors–V, Balcor Pension Investors–VI, Balcor Preferred Pension–12, Balcor Mortgage Advisors, Balcor Mortgage Advisors–II, Balcor Mortgage Advisors–III, Balcor Mortgage Advisors–V, Balcor Mortgage Advisors–VI, Balcor Mortgage Advisors–VII, Bal-

cor Mortgage Advisors–VIII, Balcor Mortgage Advisors, Inc., Balcor Mortgage Advisors–V, Inc., The Balcor Company, Balcor Securities Co., Shearson Lehman Hutton, Inc., and American Express Company, Defendants.

No. 90 C 0726.

United States District Court,
N.D. Illinois, E.D.

May 12, 1993.

Herbert Beigel, Roland Alan Schy, Beigel & Sandler, Chicago, IL, for plaintiffs.

Lee Ann Russo, David L. Carden, Robert C. Micheletto, Jones, Day, Reavis & Pogue, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

This is a purported class action. Defendants offered eight limited partnerships to investors. Thousands of investors lost money and it is claimed that defendants violated federal securities law, RICO and the common law in selling these investments. Plaintiffs have moved for certification of the class.

### BACKGROUND

The limited partnerships were sold from 1979 through 1988 and are referred to here as the "Mortgage Funds." Plaintiffs contend that defendants described the Mortgage funds to investors as conservative investments, secured by real estate and appropriate for retirement plans. The funds would make junior mortgages and take equity participation. In actuality, however, plaintiffs say the funds made much riskier investments than conventional secured mortgages. The funds would make loans that required balloon payments rather than level payments over the years. This investment structure would require substantial annual appreciation in the value of real estate in order to work.

Plaintiffs seek to represent an investor class that may be as large as 180,000—every one who bought into Balcor Pension Investors I through VII and Balcor Preferred Pension 12. The claim is for about a billion dollars. The underlying claim is not uncommon in federal courts or for that matter in this courtroom. But the class certification dispute is unusually sharp.

Some aspects of the motion for class certification are not in dispute. The defendants themselves sought conditional class certification earlier in the litigation. The members of the class are so numerous that joinder of all members is impracticable. Classes both larger and smaller have been certified. There are common questions of law and fact. I read the Complaint to challenge the accuracy of the offering materials and the manner

in which defendants operated together and ran the Mortgage Funds. The only fact claims that might lack commonality would be those founded upon oral representations. The questions of law are likely to be common in most respects.

The sharp dispute arises over the adequacy of both the proposed class representatives and class counsel, Beigel & Sandler.[1]

## ADEQUACY OF PROPOSED CLASS REPRESENTATIVES

Defendants have conducted extensive discovery of each plaintiff to ascertain their qualifications as class representatives. They now challenge each plaintiff for various reasons relating to the typicality of their claims and their ability to adequately represent the interests of the class. In particular, defendants assert that all the named plaintiffs are subject to certain defenses that are not common to the class.

 To determine whether the typicality requirement is met, the Court must compare the claims or defenses of the named plaintiffs with those of the class. *Patterson v. General Motors Corp.*, 631 F.2d 476, 481 (7th Cir.1980), *cert. denied*, 451 U.S. 914, 101 S.Ct. 1988, 68 L.Ed.2d 304 (1981). If the proposed representatives present claims or defenses that are personal to them and are likely to be a major focus of the litigation the named plaintiffs are not proper class representatives. *Id.* The defense to which the putative class representative is subject need not be a sure-fire winner. "The presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation." *J.H. Cohen & Co. v. American Appraisal Associates, Inc.*, 628 F.2d 994, 998–99

(7th Cir.1980); *Koos v. First Nat'l Bank of Peoria*, 496 F.2d 1162, 1164 (7th Cir.1974).

In resolving the issues presented by this motion, the Court is aware of the varied and, to some extent, conflicting decisions on these issues. Perhaps because each class representative brings to the case his or her own individual set of circumstances, each case turns on its particular facts and circumstances. With this in mind, the Court examines the asserted inadequacies of each named plaintiff seriatim.

### 1. Paul Williams

 Plaintiff Paul Williams purchased five limited partnership units in one of the Mortgage Funds in September 1981. He sued his independent investment advisor in connection with his Mortgage Fund investment. Beigel & Sandler represented Williams in that suit. In 1990, Ron Schy of Beigel & Sandler contacted Williams about the possibility of suing Balcor based on his investment in the Mortgage Funds. Williams testified at his deposition that he does not recall speaking again to anyone from Beigel & Sandler before the original Complaint in this action was filed naming him as the sole class representative. He saw a copy of the Complaint after it was filed.

The Complaint alleged that defendants solicited Williams and the class through written representations in the offering materials, which "contained false and misleading statements and deliberate omissions of material facts." In reliance upon those representations, the Complaint alleged, "plaintiff and the class made the investments described above." The problem with the reliance allegation is that Williams testified at his deposition that he read "very little" of the prospectus.[2] Instead, he relied on his investment

---

1. The law firm in question (and some of the same lawyers) have appeared before me in several cases. *Dubowski v. Group W. Cable*, No. 90 C 3073 (not a class action); *Latimer v. Hall*, No. 90 C 0156 (not a class action); and *In re VMS Securities Litigation*, No. 90 C 2412 (MDL class action in which the amount of damages claimed were about the same as those claimed here). In the *VMS Securities Litigation* case, this law firm has performed adequately. Of course, any decision about whether counsel for the putative class

is adequate must be based on its handling of this case.

2. At his deposition in this lawsuit, Williams testified initially that he had not read the prospectus. After an objection from his attorney that Williams may not have understood the question, Williams said he "probably read very little of it." Later in the deposition, Williams stated that he based his investment decision exclusively on the advice of his investment advisor, who was his

advisor's oral representations that the Mortgage Funds were a safe, conservative investment that would be liquid at the time of his retirement.

Plaintiffs are not entitled to a presumption of reliance in this case. They must prove actual reliance. In *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972), the Supreme Court held that reliance may be presumed "[u]nder the circumstances of this case, involving primarily a failure to disclose ..." I agree with the court in *Lubin v. Sybedon Corp.,* 688 F.Supp. 1425, 1446 (S.D.Cal.1988), that "[o]n its face, the *Affiliated Ute* presumption appears to apply only in cases based upon omissions, and not in cases based upon misrepresentations." The courts have found that in mixed cases such as this one, involving both omissions and misrepresentations, the *Affiliated Ute* presumption is not available. *See, e.g., Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718, 722 (11th Cir.1987); *Huddleston v. Herman & McLean,* 640 F.2d 534 (5th Cir.1981), *aff'd in part and rev'd in part on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *Beck v. Cantor, Fitzgerald & Co., Inc.,* 621 F.Supp. 1547, 1556 (N.D.Ill.1985). Moreover, based on the facts alleged, there is no basis for a "fraud on the market" theory that would trigger a presumption of reliance. *Cf. Lubin,* 688 F.Supp. at 1445 (presumption not applicable where limited partnerships not purchased in an open and developed securities market).

Defendants argue that Williams is rendered atypical of the class because he did not rely on the alleged misrepresentations and omissions in the offering materials. If Williams did not directly or indirectly rely on the offering materials in deciding to invest, he is subject to a unique defense inapplicable

to the remainder of the class. *See Basic v. Levinson,* 485 U.S. 224, 243, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988) ("Reliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury."); *Latigo Ventures v. Laventhol & Horwath,* 876 F.2d 1322, 1326 (7th Cir. 1989) (where misrepresentations not relied on directly or indirectly, plaintiff in fraud case cannot show harm). To the extent plaintiffs contend that Williams relied directly on the offering materials, I reject their contention based on his deposition testimony. The question remains, however, whether Williams relied indirectly on the offering materials by following the advice of his investment advisor.

Plaintiffs contend that a class representative, although he did not read the offering materials at issue, can rely on the advice of financial advisors, stock brokers and friends and still be an adequate and typical class representative.[3] Plaintiffs correctly note that the court in *Lubin* refused to deny certification even though the named plaintiff did not read portions of the offering materials. The court reasoned that it defied common sense to deny certification based on "the possibility of individual questions appertaining to one of the elements [reliance] of one of the case's causes of action." *Lubin,* 688 F.Supp. at 1460. In this Court's view, the failure of an essential element of the securities claim upon which jurisdiction is premised is a sufficient ground for denying certification here. In *Barkman v. Wabash, Inc.,* 674 F.Supp. 623, 634 (N.D.Ill.1987), the court granted certification stating that the named plaintiff's reliance on alleged misrepresentations "will become an issue only when damages recoverable by individual class members are determined." I decline to follow *Barkman.* Williams' non-reliance may very well

only source of information about the investment. Williams was also deposed in connection with the lawsuit he filed against his investment advisor. There, he testified that he did not read the prospectus. Beigel & Sandler represented Williams in both lawsuits.

**3.** In four of the cases cited by plaintiffs in support of this argument, reliance was presumed for reasons not applicable here. *See Majeske v. Balcor Entertainment Co. Ltd.,* 134 F.R.D. 240, 245–

46 (E.D.Wis.1991) (presumption of reliance created by plaintiffs' variation of fraud on the market theory); *Kahn v. Lynden, Inc.,* 705 F.Supp. 1458, 1461–63 (W.D.Wash.1989) (not necessary to show reliance in a "forced sale" situation); *Grace v. Perception Technology Corp.,* 128 F.R.D. 165 (D.Mass.1989) (reliance on public material misrepresentations presumed under fraud on the market theory); *Anderson v. Bank of the South, N.A.,* 118 F.R.D. 136 (N.D.Fla.1987) (same).

become a significant focus of this case, diverting attention away from issues common to the class, long before damage determinations as to individual class members could possibly come to the fore.

■ The Court agrees that reliance on a secondary source does not itself render a plaintiff atypical. But the better reasoned decisions require a nexus between the statements of the secondary source on which the plaintiff relies and the alleged misrepresentations in the offering materials. Two of the cases cited by plaintiffs fit this description. In those cases the courts emphasized that the statements made by the secondary source could be traced back to the offering materials that allegedly contained the false and misleading information upon which the investor ultimately relied. *See Randle v. Spectran*, 129 F.R.D. 386, 391 (D.Mass.1988) (in claim based on fraud on the market theory, reliance includes reliance on statements of third parties that merely reiterate, digest, or reflect the misstated market information); *Holton v. Rothschild*, 118 F.R.D. 280, 282 (D.Mass.1987) (plaintiff relied on advice of son who swore he read prospectus and relied on misrepresentations and omissions it contained). Here, by contrast, the record is devoid of evidence suggesting that Williams' investment advisor based his recommendations on the alleged misrepresentations and omissions in the prospectus. Williams testified that he had no knowledge of what information his investment advisor relied on in making his recommendation to invest in the Mortgage Fund. The oral representations on which Williams relied are not simply disconnected from the alleged misrepresentations in the prospectus. One of the key representations made by his investment advisor upon which Williams relied in making his investment decision is contradicted by the prospectus. Williams testified he told his advisor that a "crucial factor" guiding his investment decision was that the investment "be liquid by the time I retire[ ]" in 1985.[4] Williams' advisor assured him he would be able to liquidate his investment around the

date of his retirement. Yet the prospectus stated the investment program would terminate in approximately 2005 and that the market for the investment units would be illiquid throughout the period before the termination of the program. Also, since he never read the prospectus Williams did not learn about the inherent risks of the investment disclosed in the prospectus—risks his investment advisor never mentioned.

In sum, Williams relied on oral representations by his investment advisor that cannot be traced back to the prospectus and are, in at least one significant respect, contradicted by the prospectus. This makes Williams subject to a unique defense concerning his individual reliance that is inapplicable to the remainder of the class. Williams is therefore not qualified for certification. *Cf. Koenig v. Benson*, 117 F.R.D. 330, 338 (E.D.N.Y.1987) (named plaintiff atypical where secondary source did not accurately convey information about company); *Markewich v. Eresk*, 98 F.R.D. 9, 10–11 (S.D.N.Y.1982) (proposed class representative's claims atypical where he relied on broker's advice rather than alleged misrepresentations in financial statements). Defendants raise other objections to Williams regarding his lack of involvement in the case and lack of knowledge about the performance of his investment. The Court will not address these objections because they are not particularly weighty and the issue of Williams' non-reliance is dispositive.

### 2. *Beverly Kennedy*

■ On the same day the original Complaint was filed, Beigel & Sandler filed an Amended Complaint naming Beverly Kennedy as an additional class representative. Kennedy purchased four limited partnership units in one of the mortgage funds in 1984. As a proposed class representative, Kennedy suffers from the same sort of reliance problems that Williams suffers, only worse.

Kennedy testified at her deposition that she brought this lawsuit because she is "unhappy with the investment, because it's not what was promised." What was promised

---

4. Williams also stated he would not have invested in the Mortgage Fund if he had known it

would not be liquid in 1985.

was "an excellent investment" on which she could expect to earn a 20%–40% rate of return per year. That promise did not come from Balcor, however. It came from Kennedy's investment advisor during the one conversation they had regarding investing in the Mortgage Funds. Kennedy never read anything relating to the Mortgage Funds and she does not recall her investment advisor reading anything to her about the Funds or giving her any documents describing them.[5] She invested in the Mortgage Funds based solely on the oral representations of her investment counselor that the Funds were an excellent investment that would produce a 20%–40% rate of return annually.

Of course, the prospectus on Kennedy's investment did not say investors could expect a 20%–40% annual rate of return. It says nothing of the kind. Indeed, there is nothing in the record that ties Kennedy's investment counselor's oral representations to the prospectus describing her investment. Nor is there anything in the record suggesting that in making her investment decision Kennedy relied in any way on the alleged misrepresentations and omissions chronicled in the Amended Complaint. She never received a copy of the Amended Complaint before it was filed and never read the Amended Complaint after it was filed.

After the initial three-hour session of Kennedy's deposition Beigel & Sandler informed defendants' counsel that Kennedy was unwilling to appear for the resumption of her deposition. Defendants filed a motion to compel the resumption of Kennedy's deposition, which the Court granted. Subsequently, plaintiffs withdrew Kennedy as a class representative, purportedly for medical reasons, providing letters from two doctors to substantiate her condition. Kennedy's physical maladies aside, her infirmity as a class representative was amply demonstrated during her deposition. If she had not been withdrawn as a named plaintiff, the Court would surely have disqualified her. In any event, that Kennedy was ever selected as a proposed class representative bears on Beig-

el & Sandler's adequacy as class counsel, which defendants have challenged.

### 3. *W.B. Copeland*

■ W.B. Copeland's name first surfaced in a parallel state court action, *Copeland v. Carden, et al.*, in October of 1990. Beigel & Sandler filed the action in the Circuit Court of Cook County against defendants' attorney, David Carden, Carden's law firm and the defendants in this suit. Copeland was named as plaintiff in his capacity as trustee of Ploof Truck Lines, Inc. Profit Sharing Plan ("the Trust"), an investor in the Mortgage Funds. Beigel & Sandler filed the suit to obtain an order requiring Carden, et al., to produce the names and addresses of co-limited partners in the Mortgage Funds. As trustee, Copeland sought the list to "communicate with [ ] co-limited partners about the defendants' fraudulent activities ... breaches of fiduciary obligations ... and to organize a group to sue the defendants."

Defendants filed a motion to enjoin the alleged trustee, Copeland, from proceeding in state court. Although Judge Rovner felt constrained under the Anti–Injunction Act to deny defendants' injunction motion, she noted the symmetry between the issues raised in *Copeland v. Carden, et al.* and defendants' previously filed counterclaim. *Williams and Kennedy, et al. v. Balcor Pension Investors, et al.*, No. 90 C 0726, slip op. at 4, 1990 WL 160084 (N.D.Ill. Oct. 16, 1990).[6] It appeared then (and it appears today) that Copeland and his counsel were attempting to litigate in state court many of the same issues already raised in this action. *Id.* at 5. Thus, Judge Rovner concluded:

> it is difficult to explain the state proceeding as anything other than a blatant example of forum shopping and an attempt to score a preemptive strike against any relief which [Balcor] might obtain in this action. None of this bodes well for the orderly prosecution of this litigation.... Duplicative lawsuits typically do no more

---

5. Kennedy conceded at her deposition that she did not have a clue as to what the prospectus on her investment might say.

6. The case was transferred to this Court at the end of 1992 upon Judge Rovner's appointment to the Seventh Circuit Court of Appeals.

than squander the resources of the parties, their counsel, and the judiciary, and thus far the Court is not convinced that this case will prove to be an exception.

*Id.* at 7. Defendants then filed in state court an Emergency Motion to Dismiss *Copeland v. Carden, et al.* on the grounds that the suit was redundant of this proceeding. Judge O'Brien granted defendants' motion, dismissing the action less than a month after it was filed.

Copeland's name next surfaced in December 1990. At that time plaintiffs filed a class action counterclaim to defendants' counterclaim, naming Copeland, again in his alleged capacity as trustee of the Trust, as class representative along with another individual. Later that same month defendants moved for conditional certification of a Rule 23(b)(1) class.[7] In June 1991 Judge Rovner denied defendants' motion for conditional certification and directed plaintiffs to propose additional class representatives. Subsequently, Beigel & Sandler filed a Second Amended Complaint naming additional class representatives including Copeland, solely in his purported capacity as trustee of the Trust.

About two months after plaintiffs filed their Second Amended Complaint and a year after the filing of *Copeland v. Carden, et al.* in state court, defendants discovered that Copeland had not been a trustee of the Trust since 1987. A few days before Copeland's scheduled deposition, when they got Copeland's answers to interrogatories, defendants were informed that Copeland was suing in his capacity as "former trustee." Evidently, Beigel & Sandler first learned that Copeland was no longer a trustee when they received his draft answers to interrogatories in August or September of 1991.

Armed with the knowledge that Copeland is not a trustee and because he never personally purchased any interests in the Mortgage Funds, defendants assert that Copeland is subject to the unique defense of lack of capacity to sue. Defendants cite authority that only a trustee has capacity to prosecute an

action on behalf of a trust, *see Lewis v. Quality Coal Corp.*, 243 F.2d 769, 773 (7th Cir.), *cert. denied*, 355 U.S. 882, 78 S.Ct. 149, 2 L.Ed.2d 113 (1957) (trustees are "necessary party" in suit to recover trust property); *Lakeland Constr. Co. v. Operative Plasterers & Cement Masons, Local No. 362*, No. 79 C 3101, slip op. at *20 (N.D.Ill. Feb. 20, 1981) (same), and that former trustees, like Copeland, lack capacity to sue on the trust's behalf. *See, e.g., Blackmar v. Lichtenstein*, 603 F.2d 1306, 1310 (8th Cir.1979) (once successor trustee appointed, former trustee no longer had capacity to sue for violation of trust); G.T. Bogert, *Law of Trusts and Trustees*, § 247 (2nd ed. rev.1977). Plaintiffs' only response to defendants' lack of capacity argument worth mentioning is that the current trustees are aware of and approve of Copeland's actions on behalf of the Trust. Perhaps in anticipation of this response, defendants assert that the grant of a mere agency is insufficient to make Copeland the real party in interest with the capacity to sue on the Trust's behalf. *See, e.g., Lewis v. Canadian Pac. Ry. Co.*, 39 F.2d 834 (7th Cir.), *cert. denied*, 282 U.S. 869, 51 S.Ct. 76, 75 L.Ed. 768 (1930) (lawyer not real party in interest when hired to act in claimant's name); *Intern'l Ass'n of Firefighters v. City of Sylacauga*, 436 F.Supp. 482, 488 (N.D.Ala. 1977) ("a grant of a mere power of attorney, short of an assignment of a claim, does not change the real party in interest"); *Photometric Products Corp. v. Radtke*, 17 F.R.D. 103, 115 (S.D.N.Y.1954) (attorney found to be agent, not trustee, and hence not real party in interest where trustees gave attorney authority to act as their representative).

At the least, defendants have succeeded in casting serious doubt on Copeland's ability, as a former trustee, to prosecute this action on behalf of the Trust. Copeland's vulnerability to this unique defense disqualifies him from serving as a class representative.

### 4. *Allan Hirschfield*

Allan Hirschfield was one of several additional class representatives that plaintiffs

---

7. At a December 18, 1990 hearing on defendants' motion, Mr. Schy informed the Court that the named plaintiffs in the class action counterclaim were, unlike Williams and Kennedy, adequate class representatives: "We feel that these reps—though our initial class reps were not—we believe are both typical and adequate."

named in their Second Amended Complaint filed in July 1991. He is a citizen of Florida. Hirschfield invested in the Mortgage Funds and recommended the Funds to some of his clients while he was employed as a broker at Shearson Lehman. Sometime after defendants' counsel had propounded interrogatories to Hirschfield and prepared to take his deposition, Beigel & Sandler informed defendants of their intention to withdraw Hirschfield as a class representative.

At a September 25, 1991 hearing, Mr. Schy stated that Hirschfield had second thoughts about being a named plaintiff because he feared "that his 60–some clients would sue him for the investment he put them in." Later, by an affidavit submitted in connection with this motion, Hirschfield offered a different reason for his withdrawal. He stated that the only reason he withdrew was because defendants' counsel, despite plaintiffs' offer to reimburse their travel expenses, refused to accommodate his work schedule by traveling to Miami for his deposition.

### 5. Samuel Wegbreit

Samuel Wegbreit is the Chairman of Oak Ridge Investments, an investment advice firm that manages equity portfolios for individuals, pension plans and Keoghs. Between 1979 and 1989 he was an institutional investment trader at Morgan Stanley & Co., an options trader for O'Connor & Associates and F.P. Quinn & Co., and a commodity floor clerk for Shearson. Wegbreit has been a named plaintiff since July 1991. He made his $2,000 investment in the Mortgage Funds in 1988 through David Klaskin, a friend and broker at Shearson Lehman. At the time of Wegbreit's deposition, he and Klaskin had been business partners for about two years. Wegbreit invested in ten separate limited partnerships, five of which Klaskin purchased for him. Klaskin has not been sued in any of the lawsuits that have been filed on any of the limited partnerships that Wegbreit invested in through him.

Beigel & Sandler is or has represented Wegbreit in several multiple plaintiff lawsuits involving investments in limited partnerships. In these previous lawsuits, Wegbreit, unlike the other named plaintiffs, paid no retainer to Beigel & Sandler to represent him because "I asked them to look at the other cases and they said that because I brought them in a new case or showed them something that had merits and that because of that then I would be accepted as part of the group." [8] In the summer of 1991, Beigel & Sandler contacted Wegbreit and asked whether he would be interested in serving as a class representative in this action.

Defendants' counsel questioned Wegbreit during his deposition about why he agreed to participate in this action as a named plaintiff.

Q. What is your motivation for serving as a class representative, your personal motivation?

A. Personal motivation, that they have done a lot of things for the limited partnerships that I have been in and they have been helping me when I was unable to pay that I figured that this wasn't going out of my way too much to help them for something that I was involved in.

Q. When you say "help them" you mean help Beigel & Sandler?

A. Help Beigel, yes, help them prosecute the case.

Q. Any other motivations that you had?

A. No.

Wegbreit's quoted testimony, standing alone, gives the Court serious pause about his ability to adequately protect the interests of the class. It appears his primary motive here is to reciprocate for Beigel & Sandler's representation of him (without his payment of a retainer) in other lawsuits rather than to advance the interests of the class. Cf. Susman v. Lincoln American Corp., 561 F.2d 86, 89–91 (7th Cir.1977) (certification denied where proposed class representative's relationship with class counsel created potential conflict of interest).

---

**8.** According to Wegbreit, Beigel & Sandler normally requested as a retainer about 2% of the amount invested in the Mortgage Funds. Since he invested $250,000 in limited partnerships,

Wegbreit would have had to pay about $5,000 to retain Beigel & Sandler's services in the previous suits.

Additional factors militate against approving Wegbreit as a class representative. For example, Wegbreit testified that he does not believe he spoke to anyone at Beigel & Sandler about his investment in the Mortgage Funds before the original Complaint was filed. He did not see a copy of the Second Amended Complaint in which he is named as a plaintiff until after it was filed. Furthermore, upon reviewing the prospectus at his deposition Wegbreit said that there were no misrepresentations of fact in the prospectus that caused him to invest in the mortgage funds. These facts, when considered in combination with Wegbreit's motivation for serving as a class representative, provide ample grounds for refusing to accept him as an adequate class representative.

### 6. *Gregory Baird, M.D.*

■ Gregory Baird is a doctor with a family practice. He is employed at the Iva Medical Center. Baird is the sole trustee of the Iva Medical Center Pension and Profit Sharing Plan ("the Plan"). In 1985, he invested $3,000 of his own retirement money in the Mortgage Funds and, as trustee, he invested $5,000 on behalf of the Plan.

Like Williams and Kennedy, Baird is subject to the unique defense that he did not rely on the alleged misrepresentations and omissions in the prospectus. Baird never read the prospectuses for the Mortgage Funds in which he invested. He testified that he was ignorant as to their contents. No one ever discussed the prospectuses with him or referred to them in discussing the investments.

Baird relied primarily on the oral representations of his investment advisor in deciding to purchase interests in the Mortgage Funds. He invested in the Funds because his investment advisor told him that "these real estate mortgages and pensions were secure and profitable but yet more than CDs, and wouldn't be risky." Besides relying on his "personal intuition" and his investment advisor's expertise, Baird also stated: "it was a combination of his trustworthiness, the size of the investment and the girth of the compa-

ny, security, etc. etc. and our own ignorance of the whole topic."

None of the statements or information upon which Baird relied can be traced to the alleged misrepresentations and omissions in the offering materials. The risk disclosures in the materials belie the rosy picture that Baird says his investment advisor painted. And there is no support in the prospectus for the representation about the Mortgage Funds realizing a better return than the then current CD rate or that such a return would be assured the way it might be with a CD. Baird is therefore not typical of the remainder of the class which, according to the Complaint, relied on misrepresentations and omissions in the offering materials.

### ADEQUACY OF CLASS COUNSEL

There is some clamor about counsel generating this suit rather than the clients, and that this is unacceptable. In truth, class actions are inevitably the child of the lawyer rather than the client when the client's recovery is going to be small in relation to the costs of prosecuting the case.[9] So the courts have, in recent years, applied less rigorous standards for class representatives. There are cases in which lawyers find clients and precipitate cases where perhaps no one client would ever come forward to complain. I suppose lawyers going out to find clients is not the bad thing it was once thought to be. Legal policy has changed. Perhaps acceptance of class actions made this inevitable. Beigel and Sandler probably could have put an ad in the *Wall Street Journal* saying they handle securities law cases or real estate investment limited partnership cases, giving their phone number for the possibly aggrieved to call.

■ The elimination of higher requirements for class representatives does not mean there has been elimination of all requirements. When an attack on the class representatives is made, the court may weigh (and, in this case, the defendants ask us to weigh) not only the adequacy of class representatives but, if they are inadequate even

---

9. This is not an invariable feature of class actions. A class of laid off employees suing to get their jobs back is likely to be client driven rather than lawyer driven.

under loose standards, whether the action of potential class counsel in selecting them creates some doubt about counsel's ability to serve as lead counsel in this suit. If we recognize that counsel have a lot to do with assembling the elements of a class action law suit, including finding plaintiffs, then class counsel ought to do a good job of it.

■ Defendants assert that Beigel & Sandler's failure to make inquiry that would have revealed the infirmities of the proposed class representatives, as well as its overall handling of this lawsuit, establish its inadequacy as class counsel.[10] In reply to defendants' criticism, Beigel & Sandler spends some time discussing the seriousness of the alleged fraud, the profound damages suffered and why this means the case must go forward. That discussion is beside the point. If these class representatives are flawed this case cannot proceed in its present class action form. If there were reasonable doubts about the class representatives, it would be a mark of adequacy for counsel to have added them as early as the doubts were raised, especially given the potentially staggering amount of damages involved in this case.

The Court agrees with defendants that Beigel & Sandler's investigation of the proposed class representatives was woefully inadequate. The law firm should have known, for example, that Paul Williams had not read the prospectus that contains the alleged misrepresentations and omissions on which this suit is based. In an earlier suit against his investment advisor in which Beigel & Sandler represented him, Williams testified that he did not read the prospectus. That information could only weaken Williams' acceptability as a named plaintiff, yet the firm named him as the sole class representative in the original Complaint. Perhaps Beigel & Sandler was proceeding under the theory that Williams' reliance on a secondary source

established his reliance. A little probing would have revealed, however, that Williams relied on oral statements by his investment advisor that were either not present in or contradicted by the prospectus. If counsels' intention was to test the limits of the doctrine which holds that reliance can be shown by an investor's reliance on a secondary source, they picked an inappropriate time to do so. Adequate class counsel should lead with its strength not its chin.

It appears that Beigel & Sandler did not even speak to Beverly Kennedy before adding her as a class representative. At her deposition, Kennedy initially stated that she spoke to Ron Schy of Beigel & Sandler in February 1990. Then she said she could not recall whether it was she or her husband who spoke to Mr. Schy. A letter attached as an exhibit in opposition to this motion shows that Mr. Schy spoke to Kennedy's husband, not Kennedy, who was named and later withdrawn as a class representative. Presumably, if Beigel & Sandler had spoken to Kennedy and investigated her adequacy as a class representative, they would have soon learned that she based her decision to invest on oral representations made during one conversation with her investment advisor—representations that are foreign to the offering materials implicated in this suit.

Beigel & Sandler's inquiry into W.B. Copeland could not have been searching either. When they filed the state action in October 1990 naming Copeland as trustee of Ploof's Profit Sharing Plan, Beigel & Sandler did not know that he had resigned as trustee of the Plan in 1987. The firm certainly could not have learned of his resignation from Copeland himself. Copeland did not even know he was a plaintiff in the state action until defendants' counsel showed him a copy of the state court complaint during his deposition for this suit. In July 1991, Beigel & Sandler amended the Complaint in this suit adding

---

10. The Court recognizes that one has to take objections by defendants to adequacy of class counsel with a grain of salt. Sometimes a defendant would prefer inadequate counsel, at least if the defendant believes there is a good chance it would be found liable. Other times a defendant would prefer adequate counsel. If the defendant believes that its conduct is legally unassailable, the last thing it wants is to face a lawyer without common sense, particularly if the lawyer can bear the expense of pushing the case through discovery and trial. Even a defendant who has done wrong and knows it may prefer its opponent to be adequately represented. If it wishes to settle, it needs opposing counsel to understand the defendant must avoid bankruptcy in order to pay damages.

Copeland as a class representative in his capacity as trustee of the Plan. Beigel & Sandler finally learned that Copeland was not trustee of the Plan when they received his draft responses to interrogatories posed by defendants' counsel. Plaintiffs are correct that before they filed any pleading naming Copeland as trustee of the Plan, defendants' counsel filed a counterclaim against the Plan naming Copeland as trustee. Still, Copeland is a class representative for plaintiffs not defendants and defendants' initial error regarding Copeland's status does not alleviate class counsel's obligation to investigate the adequacy of their proposed class representatives.

The overall weakness of the remaining named plaintiffs supports the conclusion that Beigel & Sandler did not make sufficient inquiry into the proposed class representatives before filing this suit. It is not clear to the Court why Allan Hirschfield was added as a named plaintiff in July 1991 or why he was withdrawn shortly thereafter. The law firm did have fairly extensive contact with Samuel Wegbreit before he was added as a named plaintiff here. But the nature of his dealings with the firm call into question whether his priority in this suit is to promote the best interests of the class. Finally, Gregory Baird first spoke to a Beigel & Sandler lawyer on the morning of his deposition, two months after he was added as a named plaintiff. He never spoke to anyone at Beigel & Sandler about answering the interrogatories propounded to him in this action. Evidently, the firm was content to rely on Baird's wife, an attorney in South Carolina, to act as a liaison between them and their proposed class representative.

If Beigel & Sandler's performance with regard to class representatives were not enough to demonstrate its inadequacy as class counsel (and I think it does), the firm's filing of *Copeland v. Carden, et al.* supplies the proverbial straw. This Court agrees with Judge Rovner's assessment that the state action was "duplicative" of this lawsuit and "a blatant example of forum shopping." Judge Rovner was also correct in her prediction that the state action did "no more than squander the resources of the parties, their

counsel, and the judiciary ..." The state court's dismissal of the action on grounds of redundancy confirms the wastefulness of instituting the proceeding.

### CONCLUSION

The Court finds that (1) the proposed class representatives are inadequate because they are subject to defenses that are not typical of the class, and that those unique defenses are likely to be a major focus of the litigation; (2) the proposed representatives will not fairly and adequately protect the interests of the class; and (3) Beigel & Sandler's failure to make a reasonable inquiry into the adequacy of the proposed class representatives, as well as its overall handling of this litigation, establish its inadequacy to date as class counsel. Accordingly, the motion for class certification is denied.