**In re HONEYWELL INTERNATIONAL INC., SECURITIES LITIGATION.**

**Civ. No. 00–3605(DRD).**

United States District Court,
D. New Jersey.

Nov. 14, 2002.

Peter S. Pearlman, Cohn, Lifland, Pearlman, Herrmann & Knopf, LLP, Saddle Brook, NJ, Liaison Counsel.

William S. Lerach, Arthur C. Leahy, Kathleen A. Herkenhoff, A. Rick Atwood, Jr., Matthew P. Siben, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, San Diego, CA, Sandra Stein, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, Philadelphia, PA, for Plaintiffs.

John J. Francis, Jr., Drinker, Biddle & Shanley, LLP, Florham Park, NJ, Yosef J. Riemer, Sarah Slover, Scott R. Samay, Daniella T. Mayer, Kirkland & Ellis, New York City, for Honeywell International, Inc.

Jonathan J. Lerner, Christopher Malloy, Skadden, Arps, Slate, Meagher & Flom, LLP, New York City, for Michael R. Bonsignore, Giannantonio Ferrari, and Richard F. Wallman.

## *OPINION*

DEBEVOISE, Senior District Judge.

In this securities action under § 10(b) of the Exchange Act of 1934 (and Rule 10b–5 promulgated thereunder), Plaintiffs move under Fed.R.Civ.P. 23 for certification of the litigation as a class action, and for certification of a class consisting of purchasers of the stock of Defendant Honeywell International, Inc. ("Honeywell") from December 20, 1999 to June 19, 2000.[1]  In connection with the

---

1.  The proposed class excludes Defendants; member of the immediate families of individual De-

motion they request that lead Plaintiffs Jefferson State Bank, Local 144 Nursing Home Employees Pension Fund ("Local 144"), and the City of Monroe Employees Retirement System ("City of Monroe") be certified as class representatives. Because the claims of the proposed class members and representatives satisfy the requirements of Rule 23, Plaintiffs' motion will be granted.

## BACKGROUND

The essential background for the class certification analysis consists principally of the allegations in the Consolidated Complaint, dated January 31, 2001 (the "Complaint"), a detailed summary of which appears in this Court's prior opinion on Defendants' motion to dismiss under Fed R. Civ. P. 12(b)(6) (dated January 15, 2002). As a general matter, Plaintiffs allege that Defendant Honeywell and certain of its directors and officers (including Defendants Michael R. Bonsignore, Giannantonio Ferrari, and Richard F. Wallman) engaged in a scheme to defraud investors by misrepresenting the success of Honeywell's merger with AlliedSignal, Inc.[2] Plaintiffs claim that Defendants misrepresented and concealed material facts relating to Honeywell's operations and financial performance—in a scheme that began in December of 1999 and continued into June of 2000.

Supplementing the Complaint, Plaintiffs provide in connection with this motion excerpts from Honeywell's reports on form 10–K for 1999 and 2000—showing that holders of Honeywell stock numbered in the thousands. They also provide firm resumés for proposed class counsel Milberg, Weiss, Bershad, Hynes & Lerach, LLP ("Milberg") and (as liaison counsel) Cohn Lifland Pearlman Herrmann & Knopf LLP ("Cohn Lifland")— offering accounts of Milberg's extensive history of involvement in large and complex securities law class actions, and indicating that Cohn Lifland also has considerable experience in the field.

In opposing the motion, Defendants rely in large measure on selections from the Complaint itself, emphasizing allegations that describe the vast scale and great complexity of the attempt to integrate the operations of Honeywell and AlliedSignal, and allegations that describe the skepticism with which the Honeywell/AlliedSignal merger was greeted. For example, Defendants point to analyst reports quoted in the Complaint indicating that investors were anxious about the company's prospects and regarded its stock as a "show-me story." Defendants also present an array of additional materials containing statements that they argue diminished or cured the effect of the company's alleged misrepresentations.

Defendants quote the proxy statement issued in connection with the merger, which contained general cautionary language to the effect that the anticipated benefits of the merger might not be realized "as fully or as quickly" as expected for a number of reasons including the size and complexity of the operations. They also quote similar general cautionary statements in Honeywell's Annual Report for 1999; and they point to a number of statements that they contend substantially revealed many of the unfavorable, allegedly undisclosed "true facts" that, according to Plaintiffs, belied Honeywell's representation of the merger as a success. Defendants contend that these cautionary and unfavorable disclosures diminished the effect on the market of the alleged misrepresentations. A list of statements on which Defendants rely follows; where the statements to which Defendants refer relate specifically to alleged misrepresentations or omissions, references to the appropriate misstatements and/or omissions are provided [3]:

fendants; any entity in which any Defendant has or had a controlling interest; and the legal representatives, heirs, successors, or assigns of any such excluded party. The class also excludes Donald J. Redlinger, Robert D. Johnson, Peter M. Kreindler, and James T. Porter (the "Honeywell Officers"); members of their immediate families; any entity in which the Honeywell Officers has or had a controlling interest; and the legal representatives, heirs, successors and assigns of any of the Honeywell Officers.

2. The surviving entity after the merger was called Honeywell; unless otherwise indicated, all references to Honeywell in this opinion refer to the combined, post-merger company.

3. In some instances, Defendants make such connections clear; in others, they do not.

*December 20, 1999 Investor Conference*

1. A statement to the effect that the company had had "challenges" in some of its· "end markets" with Polyester and Nylon sales down 2%

   Plaintiffs allege that Honeywell concealed the fact that it had imposed unsustainable (and badly received) price increases on its customers in this area—increases that inflated its results temporarily and would ultimately result in a downturn in business. (Later statements to which Defendants refer on the same topic are also apparently cited as curative of this alleged omission.)

2. A statement indicating a decline in Honeywell's air transport sales for 2000 resulting from "a long lead nature of some of our components"

   The Complaint alleges that the Aerospace Solutions Unit had "serious and persistent problems" in obtaining a sufficient supply of components—a problem that would not be remedied until the 4th quarter of 2000. (Later statements to which Defendants refer on the same topic are also apparently cited as curative of this alleged omission.)

*July 19, 2000 Analyst Conference Call and July 19, 2000 Press Release*

3. A statement by Honeywell's Vice President and Controller with respect to merger savings that fourth quarter 1999 results would be similar to the first quarter of 2000, "basically a wash"

   As already noted, Plaintiffs allege that the company repeatedly misrepresented the success of the merger. Defendants suggest that this statement revealed that Honeywell was not achieving the merger synergies it had forecast.[4]

4. Disclosures of (1) significant declines in margins and earnings in the Performance Materials segment (resulting from increased raw materials prices and price pressures) and (2) the fact that the polyester and nylon businesses continued "to experience some

of the most difficult conditions we've seen"

5. Disclosures of overall declines in the Aerospace business

6. Disclosure of the adverse impact of lower deliveries of large scale industrial systems on the Industrial Solutions business

7. Disclosure of lower revenues in the Automation business (a "modest" decline attributed to strength in the U.S. Dollar)

   Plaintiffs allege that as a result of disruptions related to the merger Honeywell lost between $200 and $500 million in revenue from lost customers.

8. Disclosure of operations "issues" at facilities in the pharmaceutical and chip packaging businesses that had impacted earnings

   Plaintiffs allege that Honeywell's generic drug business was performing poorly—incurring $40–60 million in losses; and they allege that Honeywell's semiconductor circuit board interface project, including its pilot manufacturing operation for chip packaging, had failed, causing $40–60 million in losses.

9. A statement that "industrial control revenues were depressed by the impact of weak end markets"

*March 31, 2000 Annual Report*

10. A statement that Performance Materials Sales had decreased $162 million (4%) in 1999 and that profits had decreased $195 million (31%)—the decrease attributed to "continuing pricing pressures in the Performance Polymers and Electronic Materials businesses and higher raw materials costs in certain Performance Polymers businesses"

11. Disclosure of "lower sales for the Friction Materials business due to pricing pressures and weakness in the European market"

   The Complaint alleges as a concealed "true fact" that Honeywell's Power and

---

4. It should be noted however that in the same conference call the same official indicated that such synergies would begin to appear later in 2000.

Transportation Products unit was performing below expectations in part because of weak sales of friction materials. (Plaintiffs also claim that the underperformance was traceable to other factors, including component parts shortages and "lower heavy truck builds"—and that a new Turbocharger project was being delayed.)

12. Disclosure that Aerospace sales were "basically flat" compared with the previous year

*April 13, 2000 Conference Call*

13. An acknowledgment by Bonsingnore that Honeywell was prevented from undertaking divestitures by "pooling" accounting

The Complaint alleges that throughout the class period Honeywell concealed the fact that pooling prevented it from selling off unprofitable units.

14. An acknowledgment (also by Bonsignore) that there had been no merger savings to date

15. Reference by Bonsignore to the differences between the Honeywell and AlliedSignal and to the loss of some employees that the company "wanted to keep"

Plaintiffs allege generally that there were problems integrating the operations of the postmerger company, and more specifically that the financial and accounting systems and controls of the Honeywell and AlliedSignal were incompatible; they also claim that "huge" reductions in workforce and layoffs of "key" sales personnel resulted in lost business.

16. Disclosure of a decrease in commercial air transport sales in the first quarter of 2000 [5]

17. Disclosure of a drop in margins in Performance Materials because of higher raw materials prices and of a "price volume tradeoff" associated with price increases [6]

18. Forecast of continued losses in the Power and Transportation Business

Plaintiffs also point to price movements (downward) described in the Complaint and contend that they reflect a failure of the alleged misrepresentations to inflate the price of Honeywell stock.[7]

In support of an argument that the proposed class representatives cannot adequately represent the interests of the class, Defendants asserted, on the basis of trading records, that all the proposed representatives continued to own Honeywell stock as of the date of Defendant's Memorandum in opposition to the motion. Plaintiffs have since submitted declarations showing that only one of the proposed representatives, Jefferson Bank, continues to hold Honeywell stock, and that the others have sold off their stakes in the company.

Also in support of their position on the adequacy of the representatives (here focusing on Plaintiffs' counsel), Defendants point to errors in the accounts of losses that lead Plaintiffs provided in connection with proceedings on the appointment of lead plaintiffs. In response Plaintiffs offer explanations of the errors. The record reveals that Plaintiff Local 144 overstated its losses by more than $300,000 because it prepared the account of losses before receiving a statement form one of its investment advisors recording a large sale of Honeywell stock. Plaintiff City of Monroe overstated its losses by approximately $4,000 because of a clerical error.

---

5. It should be noted however that on the call Honeywell's Director of Investor Relations stated that Aerospace revenues overall were up 3% in the first quarter of 2000.

6. The company indicated however that its price increases in this area were "sticking" and that it expected a recovery.

7. Defendants also argue that the Complaint does not even allege price inflation before April 13, 2000. In addressing this contention, Plaintiffs offer a daily account of price movements for Honeywell stock (covering the entire class period) and point to upward price movements following several of the statements alleged in the Complaint.

## DISCUSSION

In order to receive class certification, Plaintiffs must comply with the four prerequisites of Rule 23(a), and must also satisfy the requirements of Rule 23(b)(3). *See Baby Neal for and by Kanter v. Casey,* 43 F.3d 48 (3d Cir.1994). Rule 23(a) states that certification will be available only if

1) the class is so numerous that joinder of all members is impracticable;

2) there are questions of law or fact common to the class;

3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and;

4) the representative parties will fairly and adequately protect the interests of the class.

Rule 23(b)(3) permits certification only where the court finds that the common questions of law or fact predominate over questions affecting only individual members and that a class action is the superior method for fair and efficient adjudication of the controversy. Defendants raise no specific objections respecting the numerosity, commonality, or typicality [8] requirements of the Rule; and there is in fact no substantial reason to doubt that the proposed class satisfies these requirements. While Defendants do offer substantial challenges to the adequacy of the representative Plaintiffs under Rule 23(a)(4), and object that certification would be inappropriate under Rule 23(b)(3), none of their objections they raise is sufficiently persuasive to preclude certification of the class.

## I. Rule 23(a)

### A. Numerosity, Commonality, and Typicality under Rule 23(a)

Honeywell is of course a large and prominent publicly held company, and its SEC filings confirm that its shareholders number in the thousands. It is accordingly safe to conclude that investors who purchased Honeywell shares during the designated period are too numerous to be joined.

■ It is equally clear that the claims satisfy the commonality requirement of Rule 23(a)(2). Commonality does not require an identity of claims or facts among class members. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 183 (3d Cir.2001) (citing *In re Prudential Ins. Co. of Am. Sales Practices Litig. Agent Actions,* 148 F.3d 283, 310 (3d Cir.1998); *Baby Neal v. Casey,* 43 F.3d 48, 56 (3d Cir.1994)). "The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Newton,* 259 F.3d at 183 (internal citations and quotation marks omitted).[9] Here Plaintiffs allege injuries to members of the class arising from a scheme to misrepresent the success of the AlliedSignal merger; and issues common to the proposed representatives and the members of the class consequently include the falsehood of the alleged misrepresentations, their materiality, and Defendants' scienter. This level of commonality is more than sufficient under Rule 23(a)(2).

Similarly, with respect to typicality, "[f]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." *Id.* The representative Plaintiffs' claims arise from the same alleged series of related misrepresentations that they claim injured all members of the proposed class. Their claims are therefore typical of those of the class for the purposes of the Rule.

### B. Adequacy under Rule 23(a)(4)

The adequacy of a named plaintiff depends upon two factors: counsel for the named plaintiff must be qualified, experienced and

---

8. As more than one court has pointed out, the several requirements of Rule 23 are not perfectly distinct from each other: the overlapping quality of the criteria for class certification is illustrated by the fact that Defendants' challenges to the adequacy of the representative Plaintiffs implicate concerns equally relevant to typicality. *See, e.g., Weikel v. Tower Semiconductor Ltd.,* 183 F.R.D. 377, 389 (D.N.J.1998) (noting that the typicality and adequacy analyses "tend to merge.)"

9. Unless otherwise noted, all subsequent quotations omit internal citations and quotation marks.

generally able to conduct the proposed litigation; and the named plaintiff must not have interests antagonistic to the class. *See Weikel,* 183 F.R.D. at 390 (citing *In re Prudential,* 148 F.3d at 312; *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 800 (3d Cir.1995)). In opposing certification, Defendants offer objections implicating both prongs of the adequacy analysis. First, they argue that conflicts between class members (and between the representative Plaintiffs and unnamed members of the class) preclude certification. Second, they contend that certain admitted errors on the part of Plaintiffs and their counsel in connection with proceedings relating to the appointment of lead Plaintiffs evince either dishonesty or lack of diligence and should therefore preclude a determination that Plaintiffs are adequate representatives of the class under the counsel prong of the adequacy analysis.

### 1. Intra-class Conflicts

■ Defendants point to two types of intra-class conflict that they contend should prevent class certification. The first (which could be termed a "buyer-seller" conflict) is a conflict between class members who bought at a given time and those who sold at approximately the same time within the class period: as Defendants observe, class members who bought on a given day have an incentive to show that the price they paid was inflated to the maximum possible extent by the alleged fraud, and class members who sold on that day have an incentive to show that the price at which they sold was minimally inflated by the alleged fraud. The second type of conflict (which has been termed the "equity conflict," *In re Intelligent Electronics, Inc. Sec. Litig.,* 1996 WL 67622 at *5 (E.D.Pa.13 Feb.1996)) is one between class members who continue to hold Honeywell stock (so called "retention plaintiffs") and those who have sold their holdings ("in-out plaintiffs"): Defendants argue that plaintiffs who no longer retain any interest in the company have an incentive simply to obtain the largest possible recovery, and that by contrast those who retain their stake have an incentive to maximize the combined value of their recovery and the stock that they retain.

In support of their position Defendants invoke *In re Seagate Technology II Securities Litigation,* 843 F.Supp. 1341 (N.D.Cal. 1994), and the few cases in which courts have found its reasoning convincing. The *Seagate II* court emphasized both types of conflict in concluding that class certification was inappropriate. The court viewed price inflation as the "linchpin" of several of the elements of a 10b–5 case under a fraud-on-the-market theory—including reliance, damages, loss causation, and even materiality. 843 F.Supp. at 1357. As a consequence, the *Seagate II* court found that "a conflict over price inflation is at the heart of the suit," (emphasis omitted) and that conflicts over the degree of price inflation, as might arise between purchasers with different trading histories or between purchasers who ultimately sold and those who did not, "are not only serious, but . . . are pervasive enough to threaten to preclude satisfaction of the adequacy of representation element of FRCP 23." *Id.* at 1358–59.

The *Seagate II* position has some intellectual appeal. But as one of the many courts rejecting it observed, it proves far too much. *See In re Intelligent Electronics, Inc. Sec. Litig.,* 1996 WL 67622 at *5. Conflicts such as those discussed in *Seagate II* are present in almost every large, complex securities case. Deeming them an appropriate basis for the denial of class certification would be inconsistent with Court of Appeals' strongly favorable view of the class action device in securities cases generally. *See Weikel,* 183 F.R.D. at 394–95; *Intelligent Electronics,* 1996 WL 67622 at *5 (citing (for the general approval of class action) *Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.1985); *Kahan v. Rosenstiel,* 424 F.2d 161, 169 (3d Cir. 1970)).

The *Seagate II* approach has been rejected by an overwhelming majority of courts, *see Weikel,* 183 F.R.D. at 394–95; *In re Gaming Lottery Sec. Litig.,* 58 F.Supp.2d 62, 69–70 (S.D.N.Y.1999); and its reasoning is ultimately not compelling. As one court aptly summarized the matter,

[The *Seagate II* view] . . . overstates the importance of price inflation. The chief role of price inflation remains its function

in determining each plaintiff's damages. The common questions with respect to whether misleading statements or omissions were made, whether such statements were material, and whether they were made with scienter, bind class members with more force than the varying questions related to price inflation drive them apart.

*Gaming Lottery,* 58 F.Supp.2d at 69–70; *see also In re Regal Comm. Corp. Sec. Litig.,* No. 94–179, 1995 WL 550454, at *8 (E.D.Pa. Sept.14, 1995) (noting *Seagate II's* conflict with the prior 9th Circuit case of in *Blackie v. Barrack,* 524 F.2d 891 (9th Cir.1975), and stating that "contrary to *Seagate II,* it is the existence and materiality of a misstatement or omission that is central, and from it, price inflation and reliance are presumed"). Although evidence of price inflation (or the lack of it) can be brought to bear on issues of materiality and reliance, plaintiffs can prove both materiality and reliance without showing price inflation as such.[10] Proof of loss causation, while it requires proof of some price inflation, does not require proof of any specific degree of inflation. Consequently, the sort of buyer-seller and equity conflicts that Defendants describe do not really make their presence felt in any phase of the case other than the determination of damages; and conflicts in that phase can readily be addressed through the use of subclasses.[11] *See, e.g., Weikel,* 183 F.R.D. at 395–96; *Blackie,* 524 F.2d at 911.

Because the conflicts to which Defendants point do not threaten to impair Plaintiffs' ability to represent the class on any issues other than the determination of damages— and because conflicts as to damages can, if necessary, be resolved by the use of subclasses—those conflicts should not prevent certification of the proposed class or of the proposed Plaintiffs as its representatives.[12]

## 2. Adequacy of Plaintiffs' Counsel

■ Defendants' challenge to the adequacy of Plaintiffs' counsel focuses upon errors that Milberg concedes were made in the certifications submitted in connection with proceedings on the appointment of lead Plaintiffs. By neglecting to report the sale of a large amount of Honeywell stock, Plaintiff Local 144 Nursing Home Pension Fund made a more than $300,000 error in its favor (tending to overstate its losses) in those pro-

10. A plaintiff shows materiality not by showing actual price inflation but rather by proving "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic, Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Although proof of reliance under a fraud on the market theory implies proof of some price inflation, it does not require direct proof of such inflation: plaintiffs are entitled to rely on the presumption of fraud on the market if they show material misrepresentations communicated to an efficient market; accordingly, they need not show inflation affirmatively. *See Peil v. Speiser,* 806 F.2d 1154, 1161 (3d Cir.1986) (stating that where plaintiffs prove material misrepresentations and an open and developed market, the court "will presume that the misrepresentations occasioned an increase in the stock's value that, in turn, induced the plaintiffs to purchase the stock"); *see also, Basic,* 485 U.S. at 242–49, 108 S.Ct. 978. Moreover, even if plaintiffs are called upon to rebut a defendant's argument that misrepresentations did not in fact affect price, plaintiffs' success still does not hinge on showing any particular degree of price inflation at any point in time.

11. It should also be noted parenthetically with respect to any equity conflicts that all but one of the proposed class representatives have sold off their holdings of Honeywell stock. It is accordingly no longer true (as Defendants observed in making their objections) that all the proposed class representatives are retention plaintiffs.

12. Defendants cite *In re Cendant Corp. Litigation,* 264 F.3d 201 (3d Cir.2001), in which the Court of Appeals noted (in dicta) that intra-class conflicts between plaintiffs who retain a stake in a defendant company and those who do not could compromise the ability of any named plaintiff to represent the interests of the entire class. *Id.* at 243–44. The concerns expressed in *Cendant* do not however prevent certification of the proposed class here—although they may weigh in favor of the creation of subclasses for the purposes of settlement. As the Court of Appeals' discussion in *Cendant* indicates, the conflict between in-out and retention plaintiffs does not affect all class members' common interest in establishing all the elements a defendant's liability: the conflict affects only the incentive to press for maximum recovery in settlement negotiations. *Id.* The *Cendant* court specifically referred to subclasses as a possible means of addressing the conflict. *Id.*

ceedings.[13] Defendants also note a much smaller error of approximately $4,000 (which Milberg also concedes) in the calculation of losses for Plaintiff City of Monroe Employees Retirement System.

Defendants conceded at oral argument that they had no substantial basis on which to contend that these errors resulted from dishonesty on Milberg's part (or on the part of their clients). Nevertheless, they suggest that even such inadvertent misstatements show a lack of diligence inconsistent with adequate representation of the class. To be sure, a $300,000 discrepancy should not be taken lightly, and even though it does not appear from the record that Milberg (as opposed to its clients) was directly responsible for the errors, it is hardly to the firm's credit that its submissions contained such inaccuracies. Nevertheless, it must be noted that the firm revealed the mistakes of its own accord; and taken in context, considering Milberg's long track record in large and complex securities cases, the errors do not substantially call into question the firm's ability to represent the members of the proposed class.

## II. Rule 23(b)(3)

### A. Predominance of Common Issues

Defendants contend that class certification is inappropriate under Rule 23(b)(3) because individual issues will predominate over common issues. They argue first and most emphatically that individual issues of reliance will predominate over common issues because Plaintiffs will not be able to take advantage of a presumption of reliance under a

"fraud-on-the-market" theory; in addition they contend that because Plaintiffs allege a long and complex series of misrepresentations over a period of time, individual issues of scienter, materiality, the duty to disclose, and causation will also predominate over common issues.

### 1. Reliance

■ Defendants argue that individual issues of reliance will predominate over common issues because Plaintiffs will not be able to avail themselves of a general presumption of reliance resulting from fraud on the market. They contend that the presumption is inapplicable in this case because the alleged misrepresentations did not affect the price of Honeywell stock. They point especially to statements in the Complaint itself indicating that the price of Honeywell stock actually declined immediately after many of the alleged misrepresentations; they suggest that a variety of unfavorable and cautionary statements rendered the alleged misstatements immaterial and incapable of affecting the price of Honeywell stock; and they suggest that the intense and skeptical scrutiny to which the company was subjected by investors during the class period led investors to discount the alleged misrepresentations and assume the worst about Honeywell's prospects.

Under the fraud on the market presumption, investor reliance on a statement is presumed where the statement is material and the security to which it relates trades in an efficient market—an open and developed market,[14] in which the price of the security is

---

**13.** This error in determining Local 144's losses was offset by another that attributed to another Plaintiff (Congress Asset Management) losses actually incurred by Local 144. It appears that taken together the errors did however result in an overstatement of the total losses for the lead Plaintiff group.

**14.** One court endorsed the following definitions of key terms connected to the presumption:
—An open market is one in which anyone, or at least a large number of persons, can buy or sell.
—A developed market is one which has a relatively high level of activity and frequency, and for which trading information (e.g., price and volume) is widely available. It is principally a

secondary market in outstanding securities. It usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes).
—An efficient market is one which rapidly reflects new information in price.
These terms are cumulative in the sense that a developed market will almost always be an open one. And an efficient market will almost invariably be a developed one.
*Cammer v. Bloom,* 711 F.Supp. 1264, 1276 (D.N.J.1989) (quoting Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud,* § 8.6 (Aug.1988).)

presumed to reflect all publicly available information. *Peil v. Speiser,* 806 F.2d at 1161 (stating that where plaintiffs prove material misrepresentations and an open and developed market, the court "will presume that the misrepresentations occasioned an increase in the stock's value that, in turn, induced the plaintiffs to purchase the stock"); *see also, Basic,* 485 U.S. at 242–49, 108 S.Ct. 978. Defendants "may rebut proof of the elements giving rise to the presumption, or show that the misrepresentation in fact did not lead to a distortion of price or that an individual plaintiff traded or would have traded despite his knowing the statement was false." *Id.* at 248, 108 S.Ct. 978.

Here Defendants' arguments can be read either as a challenge to the bases for the presumption or as an attempt to show that, even if the usual predicates for the presumption were present, the representations at issue did not actually affect the price of Honeywell stock. In arguing that a combination of supposedly curative statements and investor scrutiny diminished the significance of the alleged misstatements, Defendants effectively challenge their materiality—suggesting that they did not alter the total mix of public information enough to be material. Defendants thus attempt to show that one of the prerequisites for the presumption, material misrepresentation, is lacking. Defendants also attempt to rebut the presumption by showing that the information at issue (whether or not it might be deemed material in an abstract sense) did not in fact affect the price of the company's shares.[15]

Defendants implicitly invite the Court to resolve on a motion for class certification the merits of Plaintiffs' claim that Honeywell's alleged misrepresentations effected a fraud on the market. Such a deep incursion into the merits is neither feasible nor necessary at this stage of the proceedings. The Court of Appeals has noted that some examination of the merits is often an appropriate feature of the class certification analysis, *see Newton,* 259 F.3d at 166; and where it is readily apparent, as it was in *Newton,* that plaintiffs cannot offer generalized proof of essential elements of their claims, class certification should be denied. But the purpose of a court's inquiry into the merits on a motion for class certification is not to determine the likelihood of a party's success. *See Weikel,* 183 F.R.D. at 390. It is rather to determine what factual issues and legal theories will be genuinely at issue in the litigation. The court "consider[s] the substantive elements of the plaintiffs' case in order to envision the form that a trial on those issues would take." *Newton,* 259 F.3d at 166 (quoting 5 James Wm. Moore et al., *Moore's Federal Practice* § 23.46[4]). Accordingly, although the court must satisfy itself that Plaintiffs have put common questions in play, and that those questions predominate, it is inappropriate at this stage of the case for the Court to resolve disputed issues—especially where the proper resolution of those issues would require (at least) the sort of developed, post-discovery record usually associated with motions for summary judgment.[16]

Nor is it absolutely necessary at the class certification stage to call upon Plaintiffs to provide evidentiary support for their allegations. Where the court can obtain a clear sense of the shape the litigation will take without such a showing, it need not impose upon plaintiffs a burden equivalent to that of opposing a motion for summary judgment.

Far from establishing that Plaintiffs will not be able to avail themselves of the fraud on the market presumption, Defendants' ar-

---

15. In a sense the attempt to demonstrate the absence of an actual impact on price is also a backdoor attack on one or both of the bases of the presumption: granting the assumptions behind the fraud on the market presumption (that prices in efficient markets reflect material public information), if the information had no effect on price, then either it was not material or the market was not efficient.

16. It should be noted that this case does not resemble *Johnston v. HBO Film Management,*

*Inc.,* 265 F.3d 178 (3d Cir.2001), where the allegations in the complaint were "unsupported, and in some instances rebutted, by a well-developed record." *Id.* at 186. Indeed, in contesting class certification, Defendants here do not rely on any contention that the alleged misstatements were not made (or even that they were not misstatements). Instead they endeavor to show that the statements taken in context would not have affected and did not affect the price of Honeywell stock.

guments only illustrate that the applicability of the presumption will itself be a prominent question in the case—one common to all class members. There is every indication in the present record that the fraud on the market issue (along with related, and similarly common, questions of materiality) will be central to the litigation.

Defendants do not appear to argue that Honeywell shares were not traded on an efficient market. Indeed, one of Defendants' main points is precisely that the stock was the subject of intense scrutiny and that its price reflected all publicly available information, including adverse information that effectively canceled or cured the effect of any misstatements. Accordingly, one of the bases for the presumption is not in dispute. As for the other requirement—public, material misrepresentations—Plaintiffs have pleaded a wide array of misrepresentations that on their face, either separately or cumulatively, could reasonably be regarded as material. Many of the falsehoods alleged relate to large and/or vital areas of the company's operations; some refer to comprehensive assessments or measures of the performance of the company as a whole. With material misstatements allegedly communicated to an efficient market, Plaintiffs have at least a prima facie basis for invoking the presumption.

Defendants seek to show that given the total mix of information—and particularly the disclosure of adverse facts similar to those that Plaintiffs allege were concealed—the alleged misrepresentations could not have affected the price of the stock. But Defendants' discussion of the mix of information does not establish that the effect of all the misrepresentations alleged (or the cumulative effect of all the misrepresentations in the alleged scheme) was cured or canceled by unfavorable statements or investor skepticism. Perhaps if Plaintiffs alleged a more limited array of misrepresentations, and if Defendants pointed to curative statements that squarely and fully contradicted them, it would be appropriate even at this stage to conclude that the presumption was unavail-

able.[17] But Plaintiffs allege that Honeywell's favorable descriptions and optimistic predictions about the success of the merger were belied by a very long list of "true facts" that were not disclosed; and while the purportedly curative statements to which Defendants point address many of the same topics as the alleged misrepresentations and omissions, the correspondence between the alleged falsehoods and the curative information is not so exact as to preclude the argument that there was a fraud on the market. *Cf. In re Atl. Fin. Fed. Sec. Litig.*, Civ. A. No. 89–0645, 1990 WL 188927, at *2 (E.D.Pa. Nov. 28, 1990) (declining to limit class period where supposed curative statements cured "less than all" of the alleged misrepresentations constituting a fraudulent scheme).

The disclosures cited by Defendants do not by any means even generally address all of the allegedly undisclosed weaknesses in Honeywell's operations. For example, Defendants mention no disclosure relating to the alleged "true fact" that Honeywell and Pittway had sold hundreds of millions of dollars worth of goods on extended payment terms—a fact that Plaintiffs contend would ultimately contribute to Honeywell's failure to meet its cash flow forecast for 2000 (by some $500 million). Similarly, Defendants do not appear to argue that any curative statements revealed problems associated with the Pittway acquisition—or problems with Pittway's finances and operations.

Even where the record does indicate that Honeywell issued less than glowing statements on the topics that Plaintiffs raise, in most if not all instances the statements do not fully reveal the truth that Plaintiffs allege was concealed. For example, no curative statement cited by Defendants describes disruption from workforce reduction on anything like the scale that Plaintiffs claim. Similarly, Honeywell's statements on its Performance Materials business, while they admit weakness in its results, do not attribute that weakness to the "unsustainable" price increases that Plaintiffs describe: the closest

---

17. *In re Biogen Securities Litigation*, 179 F.R.D. 25 (D.Mass.1997), on which Defendants rely, is such a case. There the court (notably at the same time as it decided a motion for summary judgment) limited the length of a class period after concluding that certain alleged misrepresentations could not have affected market price.

the supposedly curative statements come is a brief reference to "price volume tradeoffs."

Moreover, the unfavorable disclosures to which Defendants point are unlikely to have diminished the significance or effect of the alleged misrepresentations relating to the state and prospects of the company as a whole. Plaintiffs plead an overarching misrepresentation of the success of the merger and the health of the Company. The disclosures that Defendants cite cannot be said to have prevented the market from relying on that larger misrepresentation.

Defendants also offer a quantitative argument—pointing the fact that the price of Honeywell stock went down after several of the statements that Plaintiffs contend inflated the price. This argument similarly fails to establish that Plaintiffs will not be able to invoke the presumption. Plaintiffs do not need to establish price inflation directly in order to avail themselves of the presumption: as noted above, it is enough for them to show material misrepresentation communicated to an efficient market. Accordingly, such quantitative arguments are relevant only to Defendants' rebuttal of the presumption; and the analysis they offer is not by any means so well developed or compelling as to warrant the conclusion that the price of Honeywell's stock was not inflated. Plaintiffs correctly point out that the mere fact that the price of a stock goes down does not necessarily imply that it is not inflated. To prove their point that Honeywell's alleged misstatements did not inflate the price (assuming that the point could be established with certainty)

Defendants would have to provide expert testimony that attempted to isolate factors affecting the price of the stock. They have provided no such evidence. Accordingly the price movements to which they point provide no basis for the conclusion that the alleged misstatements were not reflected in the price of Honeywell stock.[18]

Because Plaintiffs may properly invoke the presumption of reliance arising from a fraud on the market, there is no reason at this stage of the case to conclude that individual questions of reliance predominate over common questions, and such individual issues of reliance accordingly do not represent an impediment to class certification.[19]

### 2. Other Issues

Defendants also contend that individual issues predominate in areas other than reliance—including scienter, Defendants' duty to disclose, and materiality. They contend that because the alleged scheme incorporated many statements over a period of months, Plaintiffs who bought at different times must establish the elements of their claims on the basis of different sets of facts. While the length of the class period and the number of misrepresentations alleged undeniably complicate the case against the Defendants, neither factor warrants the denial of class certification.

Although the Complaint does cite a large number of statements and omissions, Defendants exaggerate the resulting distinctions between the factual circumstances of different buyers. Plaintiffs allege many state-

**18.** Defendants also argue that Plaintiffs do not specifically allege price inflation resulting from misrepresentations prior to April 13, 2000; and they argue that, even if class certification is generally warranted, the class period should not begin until that date. Defendants appear to suggest that Plaintiffs must specifically and separately plead price inflation with respect to every misrepresentation for which they hope to recover. Such a requirement would compel Plaintiffs to engage in a superfluous exercise in base-touching without adding any substance to the Complaint or enhancing its clarity. As already discussed, Plaintiffs allege that they incurred losses as a result of a scheme to misrepresent the success of the Honeywell/AlliedSignal merger, and they allege that misrepresentations prior to April 13, 2000 were part of that scheme—misrepresentations that, as alleged, were arguably ma-

terial. A reasonable inference from these allegations is misrepresentations throughout the class period inflated the price of Honeywell stock. (In addition, in their papers in support of this motion, Plaintiffs do specifically point to instances in which the price of Honeywell stock went up following some of the alleged misstatements; and they note one specific allegation in the Complaint of a price increase following an alleged misstatement.)

**19.** In addition it should be noted that even if the fraud on the market presumption were unavailable, individual issues of reliance might not necessarily prevent certification of the class. *See, e.g., Eisenberg,* 766 F.2d at 786–87, *cited in Weikel,* 183 F.R.D. at 402.

ments made in furtherance of single scheme to misrepresent the success of the Honeywell/AlliedSignal merger. These statements all contribute to the single, larger, continuing misrepresentation of Honeywell's success; and many of the separate statements catalogued in the Complaint are repetitions or developments of earlier representations. To a very considerable extent Defendants' potential liability to any member of the class is predicated on proof of the larger scheme.

In addition, even if Plaintiffs' claims are viewed as based upon a series of discrete statements rather than upon a single scheme, issues peculiar to individual Plaintiffs will not predominate. While the large number of representations and the long period of time involved indicate that the case will be complex, these factors do not by themselves indicate the need for determinations unique to individual Plaintiffs as opposed to individual statements. Every Plaintiff will have an interest in determining that all the statements at issue (especially all those made before he or she bought) were both false and material and were made with scienter. A Plaintiff even benefits from proof that materially false statements were made with scienter *after* his or her purchase—if only because such a showing aids his or her effort to prove scienter as to the whole scheme. The fact that Plaintiffs who bought or sold at different times might prefer to focus on different statements does not preclude class certification. It is a feature of almost any large securities case, and class certification has been granted in cases of comparable complexity. *See, e.g., Blackie,* 524 F.2d at 902 (class certification granted in action involving 27 month class period with more than 45 documents); *Atl. Fin.,* 1990 WL 188927, at *5 [20]; *see also In re Rospatch Sec. Lit.,* Nos.

1:90–CV–805 to 1:90–CV–807 and 1:91–CV–851991, 1991 WL 427890, at *5 (W.D.Mich. July 22, 1991) ("The fact that each alleged deceptive act did not occur concurrently or deal with the same subject matter does not defeat a motion for class certification.").

### B. Superiority of Class Action

■ Given the Court of Appeals' generally favorable view of class actions for the adjudication of securities fraud claims, it would be a rare case that satisfied all the requirements of Rule 23(a), and the predominance requirement of Rule 23(b)(3), and in which nevertheless class action was not deemed "superior to other available methods for the fair and efficient adjudication of the controversy" under the second prong of Rule 23(b)(3). The matters pertinent to a finding of superiority include (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action. Given the size and geographical dispersion of the proposed class and the likelihood that many purchasers will have sustained comparatively small losses, this case clearly presents exactly the sort of circumstances for which class action is suited. Individual adjudication of all the claims of class members would place an unnecessary burden on parties and the courts. Class action is manifestly the fairest and most efficient means of resolving the dispute.

---

**20.** The court in *Atlantic Financial* summed up a sound approach in the following terms:

> In any situation such as this [where a continuing scheme is alleged], the claims of each purchaser will vary depending on when the misrepresentations were made and when each plaintiff purchased the stock. However, those issues will not predominate at trial because if Plaintiffs prove which, if any, misrepresentations occurred and how this affected the market price of the stock, charting a time-line that shows the appropriate price of the stock for each day in question will take care of the problem of determining the award to each plaintiff. *See, e.g., Sirota v. Solitron Devices, Inc.,* 673 F.2d 566 (2d Cir.1982); *Blackie v. Barrack,* 524 F.2d 891 (9th Cir.1975). The fact that each plaintiff purchased the stock at different points, in the face of different alleged misrepresentations, will not make the issue of whether each statement was a misrepresentation more difficult to resolve and certainly does not mitigate against using the class action method.

## CONCLUSION

For the reasons stated above, Plaintiffs' motion for class certification under Fed. R.Civ.P. 23 will be granted. An appropriate order will be entered.