**In re RENT–WAY SECURITIES LITIGATION.**

**Civil Action No. 00–323 Erie.**

United States District Court, W.D. Pennsylvania.

Sept. 10, 2003.

Alfred G. Yates, Jr., Gerald L. Rutledge, Law Offices of Alfred G. Yates, Jr., H. Yale Gutnick, Strassburger, McKenna, Gutnick, & Potter, Pittsburgh, PA, David A. Searles, Donovan Searles, Sherrie R. Savett, Todd S. Collins, Berger & Montague, Daniel E. Bacine, Gerald Rodos, Robert A. Hoffman, Barrack, Rodos & Bacine, Philadelphia, PA, Stanley M. Grossman, Marc I. Gross, Paul T. Curley, Pomerantz, Haudek, Block, Grossman & Gross, New York City, Patrick V. Dahlstrom, Pomerantz, Haudek, Block, Grossman & Gross, Chicago, IL, Michael G. Lange, Alicia M. Duff, Jeffrey C. Block, Berman, DeValerio, Pease, Tabacco, Burt & Pucillo, Boston, MA, Charles J. Piven, Law Offices of Charles Piven, Baltimore, MD, Michael D. Donovan, Chemicles & Tikellis, Haverford, PA, Bruce W. Bernard, Bernard, Stuczynski & Bonanti, James D. McDonald, The McDonald Group, Erie, PA, Solomon B. Cera, Gold, Bennett, Cera & Sidener, LLP, San Francisco, CA, for Plaintiff.

Kevin M. Kearney, Hodgson Russ, Buffalo, NY, Paul M. Pohl, Bryan D. Kocher, Jones Day, Frederick W. Thieman, Thieman & Farrell, Pittsburgh, PA, Timothy M. Sennett, Knox, McLaughlin, Gornall & Sennett, Erie, PA, John L. Oberdorfer, Lanny Davis, Patton Boggs, Washington, DC, Robert N. Rapp, Calfee, Halter & Griswold, Cleveland, OH, for Defendant.

### *MEMORANDUM OPINION*

MCLAUGHLIN, District Judge.

Presently pending before the Court is a motion by Plaintiff Cramer Rosenthal & McGlynn, LLC ("Cramer Rosenthal") to certify a plaintiff class of those who purchased the common stock of Rent–Way, Inc. ("Rent–Way") during the period December 10, 1998 through October 27, 2000. The motion is opposed by Defendant PricewaterhouseCoopers LLP ("PwC"), Rent–Way's certified public accounting firm during the putative class period. For the reasons set forth below, we will grant Cramer Rosenthal's motion to cer-

tify the Class and appoint Cramer Class Representative.

## I. BACKGROUND

Defendant Rent–Way, Inc. ("Rent–Way") is a company in the business of renting home furnishings, appliances and other merchandise under full-service rental-purchase agreements. Between the years 1981, when it first began operation, and 1993, the year of its initial public offering, Rent–Way expanded to 19 stores in three states. Throughout the remainder of the 1990s, Rent–Way experienced dramatic growth. By the late 1990s, it was operating 125 stores and, by 2000, more than 1100 stores nationwide. As of July 2000, Rent–Way had approximately 24.3 million shares outstanding and its stock was actively traded on the New York Stock Exchange.

On October 30, 2000, trading in Rent–Way's shares was suspended pending its issuance of a press release. In the release, issued later that day, Rent–Way announced that it was investigating "certain accounting matters, including possible accounting irregularities" which, if confirmed, would require it to revise earlier reported unaudited financial results for fiscal year 2000. The press release advised that Rent–Way expected these matters to impact its fourth quarter 2000 earnings. Rent–Way further represented that, based on its preliminary investigation, it expected these accounting matters to have a negative, non-cash impact of between $25 million and $35 million pre-tax on fiscal year 2000 and no impact on any fiscal periods prior to year 2000.

Following issuance of this press release, Rent–Way's stock plummeted more than 80% in the course of one day, dropping from $23–7/16 per share to $5.00 per share. Eventually Rent–Way disclosed that the accounting irregularities had a much greater impact on its fiscal year 2000 earnings than initially predicted and that its reported results for 1998 and 1999 would also be impacted. In its Form 10–K report for fiscal year 2000, Rent–Way disclosed that the total amount of adjustments affecting pre-tax operating income relative to the accounting improprieties was approximately $74.3 million for fiscal year 2000, $21.0 million for fiscal year 1999, and $2.3 million for fiscal year 1998. In addition, Rent–Way acknowledged in its annual report for fiscal year 2000 and Form 10K that its year-end reports for fiscal years 1998 and 1999, as originally reported, and its fiscal quarter-end results for all of the quarters of 1999 and the first three quarters of 2000 were all false.

Not surprisingly, in the wake of this disclosure, numerous shareholder suits were filed against Rent–Way and its officials alleging violations of the federal securities laws. This Court consolidated the lawsuits and held a hearing to appoint a lead plaintiff. Among those seeking appointment was Cramer Rosenthal, an "investment advisor" offering "private equity, small-to-mid-cap value, large cap value and small cap value management to both tax-exempt and taxable clients," and "manage[ment of] institutional portfolios for a variety of pension, private client, and trust estate accounts." *See The EZRA Charitable Trust v. Rent–Way, Inc.,* 136 F.Supp.2d 435, 441 (W.D.Pa.2001). As an institutional investment advisor that purchased securities on behalf of its clients' accounts, Cramer Rosenthal alleged a loss of $10.1 million in connection with its purchase of Rent–Way stock—the largest loss alleged by any plaintiff. The Court appointed Cramer Rosenthal lead plaintiff after determining that Cramer was presumptively the most adequate plaintiff under the Private Securities Litigation Reform Act of 1995 (PSLRA), § 21D of the Exchange Act, as amended, 15 U.S.C. § 78u–4, and that the presumption had not been rebutted. *See generally, EZRA,* 136 F.Supp.2d at 439–445.

Thereafter, Cramer Rosenthal filed an Amended Complaint in this action naming as Defendants Rent–Way, certain of its current and former officers and directors, and PwC. In relevant part, the Amended Complaint alleges that the named Defendants violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, by disseminating materially false and misleading statements concerning Rent–Way's earnings, profitability and financial condition during the class period. As to

PwC in particular, the Amended Complaint avers that PwC falsely represented in its 1998 and 1999 audit opinions that Rent-Way's financial statements had been prepared in accordance with Generally Accepted Accounting Principles and that it had reviewed and approved of Rent-Way's false quarterly reports. It is further alleged that PwC was aware of Rent-Way's fraudulent practices and the severe deficiencies in Rent-Way's accounting system but failed to properly fulfill its obligations as auditor because it was not independent from its client. *See generally In re Rent-Way Securities Litig.,* 209 F.Supp.2d 493, 500–501 (W.D.Pa.2002) (outlining alleged deficiencies in Rent-Way's accounting system and allegedly fraudulent practices).

PwC and the other Defendants subsequently filed motions seeking to dismiss the Amended Complaint. On July 11, 2002 this Court ruled that Plaintiffs' claims against PwC were viable insofar as they pertained to alleged misrepresentations in PwC's 1998 and 1999 audit opinions, but not insofar as they related to Rent-Way's unaudited quarterly reports. *See* 209 F.Supp.2d at 500–05, 506–13. Following resolution of the Defendants' motions to dismiss, Cramer Rosenthal submitted the instant motion for class certification. PwC has filed papers in opposition to that motion asserting that Cramer lacks standing and that it has failed to satisfy the requirements of Rules 17 and 23 of the Federal Rules of Civil Procedure. We address these challenges below.

## II. DISCUSSION

### A. Does Cramer Rosenthal Have Standing to Sue?

PwC initially challenges Cramer's standing to bring the instant lawsuit on behalf of the putative class members. This Court previously addressed the issue of Cramer's standing when it considered Cramer's motion for appointment as lead plaintiff. *See EZRA,* 136 F.Supp.2d at 441–42. In granting the motion, we rejected the argument that Cramer's acquisition of Rent-Way securities for the accounts of its clients rather than for its own account disqualified it as a "purchaser" under the federal securities laws. We concluded that Cramer was a "purchaser" with standing to sue in its own right because it possessed "unrestricted decision-making authority" concerning which securities would be purchased on behalf of its clients. 136 F.Supp.2d at 442.

PwC now challenges this conclusion on the ground that it was premised on the erroneous assumption that Cramer acted as attorney-in-fact for its clients and was authorized to sue on their behalf to recover investment losses. PwC cites *Smith v. Suprema Specialties, Inc.,* 206 F.Supp.2d 627, 634–36 (D.N.J.2002) and *In re Turkcell Iletisim Hizmelter A.S. Secs. Litig.,* 209 F.R.D. 353, 358 (S.D.N.Y.2002) for the proposition that Cramer's mere authority to make investment decisions on behalf of its clients does not necessarily translate into authority to sue on their behalf and is therefore inadequate to establish Cramer's standing in this litigation. PwC argues more specifically that, in appointing Cramer lead plaintiff, this Court mistakenly relied on the declaration of Michael J. Marrone, Cramer's former Principal and Director of Operations, which asserted that Cramer "acts as attorney-in-fact for its clients and is authorized to bring suit to recover for, among other things, investment losses." (*See* PwC's Compendium of Exhibits in Supp. of its Opp. to Pl.s' Mot. for Class Cert. [Doc. No. 115], Ex.3, at ¶ 3.) In support of its bid to become lead plaintiff, Cramer submitted Mr. Marrone's declaration as well as a sample copy of a 1995 Investment Advisory Agreement that it had entered into with its clients. (*Id.,* Ex. 6.) Relying on this agreement,[1] Cramer's counsel represented to

---

1. This agreement provided, in relevant part:

 1. The Investment Advisor will provide the Client with investment management services with respect to securities and other assets owned by the Client, (The "Account") as well as provide counseling with respect to other investment opportunities in accordance with written instructions, if any, and in the absence of any such instructions with the primary objective of capital appreciation and without restrictions on portfolio investments.

 2. (a) The Client hereby authorizes the Investment Advisor, as its agent and attorney-in-fact, to issue to brokers or principals of other investment organizations, instructions to purchase, sell and otherwise to trade in and

the Court that Cramer "in fact had a power of attorney" and was "acting as attorneys in fact for the clients." (*Id.* at Ex. 7, p. 10.)

It now appears that this 1995 sample agreement was irrelevant to the present litigation and that different agreements, dated 1997 through 2000, were the ones applicable to the putative class period. These latter documents, PwC contends, do not grant Cramer the authority to act as attorney-in-fact for, or file suit on behalf of, its clients. We consider this argument as it relates to both Cramer's individual clients and its mutual fund client (the CRM Small Cap Value Fund).

### 1. *Cramer's Individual Clients*

■ Cramer's individual clients generally include taxable and tax exempt organizations and institutions such as pension funds and trusts and estate accounts. They have entered into investment advisory agreements with Cramer which vary somewhat in format,[2] but which generally confer upon Cramer "full [investment] authority." The various forms of agreements generally contain the following (or substantially similar) language relative to Cramer's investment management services:

> With respect to the Account, [Cramer] shall have full authority in its discretion to purchase, sell, tender, exchange, convert or

deal with, any security or investment for the Account, and in the name of the Client. the Investment Advisor is authorized to so act for the Client with respect to any transaction without prior consultation with the Client.
> (b) The Client by executing the attached power of attorney and completing the enclosed offeree questionnaire hereby authorized the Investment Advisor to invest up to _____ % of the Account in private placements or other securities subject to restrictions on resale.
> (c) The Client hereby authorized [sic] the Investment Advisor as its agent and attorney-in-fact, to instruct the Custodian to deliver securities sold, exchanged or otherwise disposed of from the Account and to pay cash for securities delivered to such Custodian upon acquisition for the Account. This authorization does not, however, include authority to deliver or pay securities or cash (other than payment of the advisory fee) to the Investment Advisor.

(PwC's Compendium of Exhibits [Doc. No. 115], Ex. 6–A at ¶ 2.)

exercise and otherwise acquire or dispose of and trade and deal in or with stocks, bonds and other securities of every name and nature *and rights in respect thereof,* (all of the foregoing hereinafter called "Securities"), and to execute such assignments as may be necessary or proper in connection with the mangement [sic] of the Account by [Cramer].... [Cramer] shall manage the Account with the primary investment objective of capital appreciation and without restrictions on portfolio investments, unless [Cramer] receives written instructions from the Client regarding its investment objectives and restrictions (if any), in which case [Cramer] shall manage the Account in accordance with such instructions.

(PwC's Ex. 9 at ¶ 2(a)) (emphasis supplied); *Cf. id.,* Ex. 10 at ¶ 2; Pwc's Supplement to Compendium at CR04040 at ¶ 2(a).[3]

Having reviewed the relevant agreements at some length, the Court is satisfied that Cramer has standing to pursue this litigation on behalf of the Fund. Fundamentally, we do not view the "power-of-attorney"/"attorney-in-fact" language (or lack thereof) as a controlling factor. In point of fact, this Court's prior ruling in *EZRA* was premised not on the existence of such language but on the undisputed authority Cramer possessed under the putative agreement to "independent-

2. PwC submitted (both in its compendium and at oral argument) redacted copies of several sample agreements that Cramer used with various individual clients. Based on representations from counsel at oral argument, the Court is satisfied that it has been provided a sufficient representative sample of such agreements for purposes of resolving the instant motion.

3. Another sample agreement confers upon Cramer' employees, as investment managers, "full discretion to make all investment decisions for the assets placed under its control, while observing and operating within all policies, guidelines, constraints, and philosophies as outlined in this statement." Among Cramer's specific responsibilities are "performing discretionary investment management including decisions to buy, sell, or hold individual securities and to alter asset allocation within the guidelines established" by the client. (*See* PwC's Supplement to Compendium at CR 04144.)

ly determine[ ] which securities to purchase for its clients' accounts." 136 F.Supp.2d at 442. *See also id.* (citing *Monetary Mgmt. Group of St. Louis, Inc. v. Kidder, Peabody, & Co., Inc.,* 604 F.Supp. 764 (E.D.Mo.1985) and *Lemanik, S.A. v. McKinley Allsopp, Inc.,* 125 F.R.D. 602 (S.D.N.Y.1989) for the proposition that "investment advisors with the delegated authority to make investment decisions for clients are purchasers under the securities laws"). Based on that factor, we concluded that Cramer qualifies as a "purchaser" within the meaning of the federal securities laws and thereby has standing to file suit under the PSLRA. *See* 136 F.Supp.2d at 441–42. We find this approach to be consistent with § 10(b)'s fundamental purpose of "requiring full and fair disclosure to participants in securities transactions of the information that would be useful to them in deciding whether to buy or sell securities." *O'Brien v. Continental Illinois Nat'l Bank and Trust Co. of Chicago,* 593 F.2d 54, 60 (7th Cir.1979). Thus, our inquiry turns not on the presence or absence of specific "attorney-in-fact" language in the agreements, but on the level of discretion exercised by Cramer in the day-to-day purchase of securities for its clients.

Functionally, in terms of Cramer's contractual role as an "investment advisor," there is no material difference between the 1995 Investment Advisory Agreement at issue in *EZRA* and those which actually governed Cramer's relationship with its individual clients during the putative class period. All forms of the agreements essentially give Cramer full authority to make investment decisions and manage the daily affairs of the accounts, generally without any need for prior consultation with the client. Both provide that investment management decisions shall be made with the basic strategy of capital appreciation and without restriction on portfolio investments, except to the extent that specific written direction is otherwise provided by the client. Although the relevant agreements do not include any formal execu-

tion of power-of-attorney, they broadly convey Cramer the power to exercise "all rights in respect [of the client's securities]." In short, notwithstanding the absence of "attorney-in-fact" language in the relevant agreements, our previous finding that Cramer "independently determined which securities to purchase" for its client during the putative class period remains intact. This fact is confirmed by the deposition testimony of Scott Scher, the portfolio manager responsible for the purchases of Rent–Way stock during the putative class period. (*See* Suppl. Decl. of Solomon B. Cera [Doc. No. 116], Ex. A at p. 14 (indicating that Mr. Scher had "for lack of a better word, complete discretion to make buy and sell decisions").)

PwC maintains that the various agreements Cramer had with its individual clients contain detailed limitations governing the purchase of investment vehicles which differ from client-to-client and which contradict our previous finding that Cramer had "unrestricted decision-making authority." *See EZRA,* 136 F.Supp.2d at 442. To be sure, the relevant agreements all require that Cramer's investment decisions comport with any written instructions and/or investment objectives issued by the client. But this caveat is no different from that which existed under the 1995 agreement at issue in *EZRA.* (*See* PwC's Compendium, Ex. 6 at ¶ 1 (stating that Cramer will provide investment management services and counseling "in accordance with written instructions received from the Client regarding investment objectives and investment restrictions, if any.").) Moreover, we have examined the sample "restrictions" provided by PwC and we find them to be typical of the broad parameters normally established by institutional clients operating within the bounds of their respective charters and by-laws. Generally speaking, these "restrictions" fall into one of several categories, *i.e.:* (a) those that broadly define the client's investment objectives or strategies[4]; (b) those that establish basic

---

4. *See, e.g.,* PwC's Compendium [Doc. No. 115] at Ex. 10, CR 04008 (establishing general portfolio "guidelines" consistent with Cramer's own stated investment style, *to wit:* number of holdings between 50–60 issues, price/earnings and price/

book ratios less than the Russell 2000 Index, market capitalization range consistent with the Russell 2000 Index, etc.); *Id.* at 04009 (indicating performance objective of outperforming the Russell 2000 Index by 2.5 % per annum over a

parameters for asset allocation and diversification[5]; (c) those that prohibit certain categories of investment vehicles deemed unduly risky by the client or which might violate fiduciary duties or applicable law[6]; and (d) those prohibiting certain investments practices that the client deems socially irresponsible.[7] These sort of general investment goals, guidelines and limitations do not undermine Cramer's "purchaser" status because, once again, the key to our inquiry is the level of discretion exercised by Cramer in the day-to-day purchase of securities for its clients, particularly (for present purposes) insofar as it relates to Cramer's purchase of Rent–Way stock. Notwithstanding the general limita-

tions imposed by these agreements, we see nothing which detracts from our original view that Cramer "independently determined which securities to purchase for its clients' accounts." *EZRA*, 136 F.Supp.2d at 442. As decision-maker for its clients vis-a-vis the purchase and management of securities, Cramer had an interest in its own right to receive full and fair disclosures concerning the true value of Rent–Way's stock. Accordingly, we continue to hold, consistent with *Monetary Mgmt. Group of St. Louis, Inc.* and *Lemanik*, that Cramer is a "purchaser" under the PSLRA with proper standing to pursue this litigation on behalf of its individual clients.[8]

---

"full market cycle"); *Id.* at CR 04013 (performance goal of client trust is to equal or exceed the actuarial rate of return and equal or exceed the average return of appropriate capital market indices weighted by the asset allocation target percentages over rolling five-year periods).

5. *See, e.g.*, PwC's Compendium [Doc. No. 115] at Ex. 9, CR 03962–03963 (requiring that no position of any one issuer, other than the federal government, exceed 8% of the manager's portfolio; requiring that no purchase cause the client to acquire more than 5% of the outstanding shares of a company; requiring that the equity portion of each portfolio include at least 20 positions); *Id.* at Ex. 10, CR 04008 (setting maximum cash allocation at 10% of the portfolio's market value, setting maximum allocation to any one sector at 30% of the portfolio's market value, requiring that no one issuer's securities comprise more than 10% of the portfolio, etc.); *Id.* at CR 04014 (establishing asset allocation targets of 50% large cap value equities, 20% small cap value equities, 20% international equities, 10% fixed income).

6. *See, e.g.*, PwC's Compendium [Doc. No. 115] at Ex. 9, CR 03962 (requiring that any short-selling, securities lending or options tradition be made only for the limited uses of hedging portfolio risk, prohibiting investment in commodities, precious metals, non-marketable securities, limited partnerships and real estate); *Id.* at Ex. 10, CR 04007–04008 (prohibiting investment in short sales, selling on marking, transactions involving a broker both as principal and investment manager, private placements, unregistered or restricted stock, futures, options, commodities, etc.); *Id.* at CR 04016 (prohibiting activities where broker is both principal and investment manager, prohibiting any or all investment activities forbidden by the SEC or other governing bodies).

7. *See, e.g.*, PwC's Compendium [Doc. No. 115] at Ex. 9, CR 03963 (requiring that investment man-

agers "display ongoing social responsibility in matters relating to the value of justice; the connection of oppressive and exploitive practices around the world; the dignity of individuals, the need to provide equal opportunities for all employees and the utilization of profits in a just and responsible manner ..."); Suppl. To PwC's Compendium [Doc. No. 138] at CR 04045–04046 (establishing guidelines for socially ethical investment standards: e.g., improve quality of life through fair labor practices, refrain from major dealings with governments known to violate human rights, refrain from producing weapons of mass destruction, avoid marketing harmful products, etc.).

8. PwC invites us to reconsider our reliance on *Congregation of the Passion, Holy Cross Province v. Kidder Peabody & Co.*, 800 F.2d 177 (7th Cir. 1986), which PwC criticizes as irrelevant to this action and not widely followed. In *EZRA* we cited *Congregation* for the proposition that "delegation of substantial investment discretion may disqualify the delegating party from purchaser status." *EZRA*, 136 F.Supp.2d at 442. That statement continues to be an accurate statement of the law, as *Congregation* has not been overruled or abandoned by the Seventh Circuit. Whatever the persuasiveness of *Congregation*, however, its holding was not central to our decision in *EZRA*. *Congregation* involved a slightly nuanced scenario in which the investor/client sued both its investment advisor and the broker with whom the investment advisor had dealt. *Congregation* held that the client could not state a cause of action under § 10(b) where the client had not participated in the actual investment decision, as the client had made no decision "in connection with the purchase" of a security. *Congregation* did not directly address the issue of whether the investment advisor could achieve standing under § 10(b) as a purchaser, although it suggests that result.

PwC also invites our attention to *Smith v. Suprema Specialties, Inc.*, 206 F.Supp.2d 627

### 2. Cramer's Mutual Fund Client

■ Approximately thirty percent (30%) of the Rent–Way shares purchased by Cramer during the putative class period were purchased on behalf of the CRM Small Cap Value Fund, which is a part of WT Investment Trust I, a Delaware business trust. Under the terms of its Investment Advisory Agreement with WT Investment Trust I, Cramer is employed "to invest and reinvest the assets of the Series" and is "authorized, in its discretion and without prior consultation with the Fund, to purchase and sell for each Series, securities and other investments consistent with the Series' objectives and policies." (*See* PwC Ex. 11, at ¶¶ 1, 2(A)(ii).) The Agreement further provides that Cramer "shall for all purposes herein be deemed to be an independent contractor and shall, except as expressly provided or authorized (whether herein or otherwise), have no authority to act for or represent the Fund in any way or otherwise be deemed an agent of the Fund." (*Id.* at ¶ 1.) There is no language in the Agreement expressly granting Cramer "power-of-attorney" or the specific right to sue on the Fund's behalf. PwC contends that Cramer lacked authority under this agreement to act as the attorney-in-fact for the Fund. Consequently, it argues, Cramer has no standing to pursue this litigation on the Fund's behalf.

We need not determine whether the delegation of decision-making authority in the WT Investment Trust Agreement was sufficient to create "purchaser" status upon Cramer, however, because we find that, in any event, the Fund has acted to ratify Cramer's actions. Cramer has submitted a letter from Robert J. Christian, President of the WT Mutual Fund, which states, ". . . I wish to confirm the Fund's and the Trust's complete support for and approval of the actions taken by Cramer Rosenthal in pursuing the legal rights of the CRM Fund in connection with this matter, including obtaining the lead plaintiff position." (*See* Decl. of Elizabeth Coley [Doc. No. 118] at Ex. A.) Cramer contends that, even if it lacked standing in its own right to bring the instant claims, this letter ratifies Cramer's conduct in so doing and is the functional equivalent of a power-of-attorney. *See In re Nat'l Paragon Corp.*, Civ. A. No. 87–4454, 1987 WL 27024 at *1 (E.D.Pa. Dec.1, 1987) (for purposes of Fed.R.Civ.P. 17, ratification is sufficient if it clearly identifies the action as the subject of the instrument, authorizes the continuation of the action by one other than the real party in interest, and expresses the agreement of the real party in interest to be bound by the outcome of the action) (citing *ICON Group, Inc. v. Mahogany Run Dev. Corp.*, 829 F.2d 473 (3d Cir.1987)).

PwC contends that this "after-the-fact ratification" is insufficient to remedy Cramer's lack of standing. It cites *Williams v. Balcor Pension Investors*, 150 F.R.D. 109, 116 (N.D.Ill.1993), for the proposition that "the grant of a mere agency" is insufficient to make Cramer the real party in interest with the capacity to sue on its clients' behalf. We are unpersuaded. First, we find *Williams* inapposite to the instant case in that *Williams* involved a *former* trustee seeking to represent the trust in litigation. The court in *Williams* recognized a line of authority holding that only a (current) trustee has capacity to prosecute an action on behalf of a trust. *See* 150 F.R.D. at 116. In response to the plaintiffs' argument that the current trustees knew and approved of the former trustee's actions on behalf of the trust, the defendants argued that "the grant of a mere agency is insufficient to make [the former trustee] the real party in interest with the capacity to sue on the Trust's behalf." *Id.* (citing cases). The *Williams* court did not resolve this issue, but merely

---

(D.N.J.2002) and *In re Turkcell Iletisim Hizmelter, A.S. Secur. Litig.*, 209 F.R.D. 353 (S.D.N.Y. 2002), both of which cite this Court's ruling in *EZRA* for the apparent proposition that an investment advisor can be eligible as lead plaintiff only if it acts as attorney-in-fact for its clients. *See Smith*, 206 F.Supp.2d at 634 ("[W]here a court appoints an asset manager as lead plaintiff, the plaintiff should provide evidence that it 'acts as attorney-in-fact for its clients and is authorized to bring suit to recover for, among other things, investment losses.' "); *Turkcell*, 209 F.R.D. at 358 ("[*EZRA*] is distinguishable on the grounds that the fund in that case was the attorney-in-fact for the investors," and therefore could sue on behalf of its clients). Because these cases unduly restrict our prior ruling, we find them unpersuasive.

noted that defendants had cast "serious doubt" on the former trustee's ability to prosecute the lawsuit, thus rendering him unsuitable as a class representative. Because Cramer is not in a position similar to the former trustee in *Williams,* we decline to follow the holding of that case.

Moreover, we note that the agreement between Cramer and the Fund specifically allows for situations where Cramer is "otherwise authorized" to act on the Fund's behalf. (*See* PwC's Ex. 11, CR03858, at ¶ 1 ("[Cramer] . . . shall, *except as expressly provided or authorized (whether herein or otherwise),* have no authority to act for or represent the Fund in any way or otherwise be deemed an agent of the Fund.") (emphasis supplied).) We conclude that this is one such situation where the Fund has duly authorized Cramer, albeit *post-hoc,* to act on its behalf.

PwC also disputes the sufficiency of the ratification in that the letter omits language specifically indicating that the Fund agrees to be bound by the outcome of this litigation. Assuming that *ICON Group* and *National Paragon* require as much, any defect in the form of the letter is curable. Although we think the Fund's agreement to be bound by this litigation is implicit in Mr. Christian's letter, we will allow Cramer Rosenthal ten (10) days from the date of this Memorandum Opinion and Order to submit an amended ratification which formally comports with the mandates of *ICON Group* and *National Paragon.*

### B. Is Cramer Rosenthal an Appropriate Class Representative under Rule 17?

■ PwC next contends that Cramer fails to meet the requirements of Rule 17 of the Federal Rules of Civil Procedure. Rule 17(a) states that "[e]very action shall be prosecuted in the name of the real party in interest." Fed.R.Civ.P. 17(a). As PwC observes, the purpose behind this rule is to protect a defendant from a subsequent action by the party actually entitled to recover and to insure that the judgment will have its proper *res judicata* effect. *In re Nat'l Paragon Corp., supra,* at *1. PwC claims that Cramer is not the real party in interest and this litigation therefore will not provide PwC the

appropriate *res judicata* protection because Cramer lacks authority to pursue this litigation on its clients' behalf and is not in privity with them. Essentially, this is a variation of PwC's argument that Cramer lacks standing to bring this lawsuit. Because we have concluded that Cramer *is* authorized to bring the instant action on behalf of its clients, we remain convinced that Cramer is in privity with its clients and that the latter are bound by the outcome of this action. Accordingly, there is no basis to depart from our prior ruling that the concerns of Rule 17(a) are satisfied. *See* 136 F.Supp.2d at 443.

### C. Is Class Certification Appropriate Under Rule 23?

We turn next to the issue of whether class certification is appropriate under Rule 23 of the Federal Rules of Civil Procedure. In order to obtain class certification under Rule 23, Cramer Rosenthal must first establish all four elements of Rule 23(a), *to wit,* (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. *Johnston v. HBO Film Management, Inc.,* 265 F.3d 178, 183 (3d Cir.2001). Assuming that those elements are satisfied, Cramer must then demonstrate that the class fits within one of the three categories of actions described in Rule 23(b). Subsection (b)(3), the provision at issue here, permits class certification if "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

■ As the proponent of the Class, Cramer bears the burden of demonstrating that all of the Rule 23 criteria are met. *Szczubelek v. Cendant Mortgage Corp.,* 215 F.R.D. 107, 114–15 (D.N.J.2003). It cannot simply reiterate conclusory allegations to satisfy the requirements but must instead allege sufficient facts demonstrating that all of the requirements for bringing a class action are fulfilled. *Id.*

### 1. Numerosity

The "numerosity" element requires a finding that the putative class is "so numerous that joinder of all members is impracticable." *Johnston*, 265 F.3d. at 184. This requirement does not demand that joinder be impossible, only extremely difficult or inconvenient. *Szczubelek* at 115–16. Numerosity is generally satisfied where the class claims involve more than forty plaintiffs. *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir.2001), *cert. denied*, 536 U.S. 958, 122 S.Ct. 2661, 153 L.Ed.2d 836 (2002). Nevertheless, it is not required that the lead plaintiff demonstrate the precise number of class members when a reasonable estimate can be inferred from the record. *Szczubelek* at 115–16.

Here, Plaintiffs propose a class of all those who purchased Rent–Way stock during the period December 10, 1998 through October 27, 2000 and who were damaged thereby. (*See* Amended Consolidated Class Action Complaint, ¶ 23.) Cramer estimates that over 48 million shares of Rent–Way stock were purchased during the class period. It alleges that the putative class members would number at least in the "hundreds or thousands." [9] (AC at ¶ 24.) We agree that the proposed class is sufficiently numerous and geographically dispersed such that joinder of all plaintiffs would be impracticable. Accordingly, the criterion of numerosity is met here.

### 2. Commonality

"Commonality" requires a finding that there are questions of law or fact common to the class. Fed.R.Civ.P. 23(a)(2). Commonality does not require that there be an identity of claims among class members. Instead, this element imposes a somewhat lenient standard and is satisfied when the named plaintiffs share at least one question of fact or law with the grievances of the prospective class. *Johnston*, 265 F.3d at 184; *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d

Cir.1994); *In re the Prudential Ins. Co. of Amer. Sales Practices Litig.*, 148 F.3d 283, 310 (3d Cir.1998).

In this case, the Amended Complaint alleges numerous common issues, such as (i) whether Defendants' actions violated the federal securities laws, (ii) whether various statements made by Defendants during the class period constituted misrepresentation or omission of material fact relative to Rent–Way's business operations, financial condition, etc., (iii) whether PwC's audit opinions as presented in the fiscal 1998 and 1999 Form 10–K SEC filings were materially false and misleading as alleged by Plaintiffs; (iv) whether Defendants acted with knowledge or reckless disregard for the truth in allegedly misrepresenting and/or omitting material facts; and (v) whether the price of Rent–Way's stock was artificially inflated during the class period due to the Defendants' alleged misstatement and/or omissions. Defendants do not contest that commonality exists and we find that it is readily satisfied on this record.

### 3. Typicality

The element of "typicality" requires that a class representative's claims "arise from the same event, practice or course of conduct that gives rise to the claims of the class members and be based on the same legal theory." *Rent–Way*, 136 F.Supp.2d at 444. Thus, we must consider whether "the named plaintiff[s'] individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that upon which the claims of the other class members will perforce be based." *Johnston*, 265 F.3d at 184 (quoting *Eisenberg v. Gagnon*, 766 F.2d 770, 786 (3d Cir.1985)) (alterations in original). To satisfy this criterion, it is not necessary that all putative class members share identical claims. Rather, typicality is met if the claims of the named plaintiffs and putative

9. In its Annual Report on Form 10–K for the year ending September 30, 1999, Rent–Way represented that there were 194 record holders of Rent–Way common stock as of December 6, 1999. (Cera Decl. [Doc. No. 98], Ex. A.) "Record holders" refers to brokerage houses holding stock in "street name" for the benefit of the underlying beneficial owners. *See In re Victor Tech. Sec. Litig.*, 792 F.2d 862, 863 (9th Cir. 1986). As Cramer observes, there are many more beneficial holders than record holders.

class members involve the same conduct by the defendant. *Id.*

■ Here, Plaintiffs have alleged that each of the quarterly and year-end financial statements issued by Rent–Way during the class period was materially false and misleading. In addition Plaintiffs allege that PwC's audit opinions for fiscal years 1998 and 1999 were materially false and misleading. Further, Plaintiffs allege that the price of Rent–Way's stock was artificially inflated as a result of these statements, thereby causing injury to all persons who purchased it. Because the Defendants' alleged misconduct would have affected the putative class members in a similar manner, the criteria of "typicality" is met.

PwC insists that typicality is lacking here because, in its view, Cramer is subject to a number of unique defense (including lack of standing) which render it unsuitable as a class representative. Inasmuch as we have already concluded that Cramer possesses the requisite standing, we will not address that "unique defense" further. The remaining "unique defenses" we address below.

## A.

■ As one prong of attack under Rule 23(a)(3), PwC argues that Cramer based its decision to purchase Rent–Way stock not on market information but on personal conversations that Cramer's portfolio manager, Scott Scher, had with members of Rent–Way's management. Specifically, it appears that Mr. Scher had conversations on August 31, 2000 with Rent–Way's President and Chief Operating Officer, Jeffrey Conway and its Vice President and Chief Financial Officer, Bill McDonnell, concerning an August 2000 article published in *Off Wall Street* which suggested accounting irregularities at Rent–Way. According to PwC, Scher's deposition establishes that he had lengthy conversations with Mr. Conway concerning the allegations during which Conway denied any irregularities and allegedly lied about Rent–Way's financial condition. PwC contends that Cramer is subject to the unique defense that its purchases of Rent–Way stock were not based on market information, but on personal assurances of Rent–Way management and unique facts not provided to typical investors.

We find this argument unconvincing. The evidence presently of record suggests that all of the information obtained by Mr. Scher as a result of his meeting with Messrs. Conway and McDonnell—such as information about how Rent–Way managed inventory, Rent–Way's growth plans, its long-term acquisition goals, its alliance with Gateway, etc.—was information available from public sources such as analysts' reports, SEC forms, and proxy statements. In addition, Cramer notes that approximately 50% of the Rent–Way shares purchased relative to this action were acquired prior to Mr. Scher's August 31, 2000 meeting.

■ Ultimately, we do not view these issues as present roadblocks to class certification. Defenses relevant to the merits of a representative plaintiff's claim are not appropriate for resolution at the class certification stage. *See Seidman v. American Mobile Sys.*, 157 F.R.D. 354, 361 n. 11 (E.D.Pa.1994), and this includes defenses based on alleged non-reliance. *See Moskowitz v. Lopp*, 128 F.R.D. 624, 631 (E.D.Pa.1989); *Gavron v. Blinder Robinson & Co., Inc.*, 115 F.R.D. 318, 323–24 (E.D.Pa.1987); *Fickinger v. C.I. Planning Corp.*, 103 F.R.D. 529, 531 (E.D.Pa.1984); *Cohen v. Uniroyal, Inc.*, 77 F.R.D. 685, 695 (E.D.Pa.1977). Furthermore, the mere possibility of a defense unique to the representative plaintiff does not render its claims atypical unless it appears the defense will become a "major focus" of the litigation. *Deutschman v. Beneficial Corp.*, 132 F.R.D. 359, 373 (D.De.1990); *Rendler v. Gambone Bros. Dev. Co.*, 182 F.R.D. 152, 158 (E.D.Pa.1998). The present record does not suggest that these "unique defenses" will become a major focus of this litigation. Accordingly, they do not undermine Cramer's showing that it meets the typicality prong of Rule 23(a).

## B.

■ PwC next argues that Cramer is atypical because there is "substantial doubt" as to whether it actually relied on the integrity of an efficient market in purchasing Rent–

Way stock. PwC claims that Scott Scher purchased Rent–Way's stock because he did *not* believe the company's stock price reflected all of the publicly available information relevant to the value of the company and its future earnings. PwC urges that Cramer should not be entitled to rely on the "integrity-of-the-market" theory and that, accordingly, this unique defense will further set it apart from the other putative class members.

We are not persuaded. A fair reading of the cited portions of Mr. Scher's deposition confirms that, as portfolio manager for Cramer Rosenthal, Mr. Scher believed that the market does in fact incorporate publicly available information about a particular stock.[10] Mr. Scher testified that part of his job as a portfolio manager included attempting to purchase under-valued stocks on behalf of his clients, i.e., stocks whose current market price does not reflect the true underlying value of a security. (*See* Scher Depo., PwC Ex. 1 at p. 90) ("When you buy a stock that you believe is under valued, you believe the current stock price does not adequately reflect the merits and future cash flows of the company, and you believe over a certain period of time the stock will be significantly higher because the market will come to recognize the underlying value of the company."). In the cited portions of his deposition, Mr. Scher did not discuss whether the believed Rent–Way's stock was under-valued during the putative class period. In any event, however, we do not view Mr. Scher's investment philosophy as necessarily inconsistent with Cramer's "fraud-on-the market" theory. Inherent in Mr. Scher's philosophy is the assumption that the market ultimately absorbs and accurately reflects publicly available information concerning a particular company. To the extent any inconsistency can be argued, this "defense" is unlikely to become a major focus of the litigation. Therefore, we see nothing in Mr. Scher's deposition testimony which undermines a finding

that Cramer's claims are typical of those of the other class members.

### C.

▇ PwC next attacks Cramer's claim of "typicality" by pointing out that Cramer made purchases of Rent–Way's stock even after Rent–Way disclosed its accounting irregularities and, indeed, after the date that Cramer sought to become lead plaintiff in this case. However, it appears that these purchases were made by a different portfolio manager, Christopher Fox, who was managing a hedge fund at Cramer Rosenthal. The record evidence shows that Mr. Fox made these purchases beginning on November 15, 2000 for some of the hedge fund products he managed. The purchases were made based on his own personal investment experience and his "gut instinct" that the Rent–Way stock had been oversold and its price would bounce back. (*See generally* Cera Supp. Decl. [Doc. No. 116] at Ex. E.)

We agree with Cramer that these purchases, having occurred after the putative class period, are irrelevant to the instant litigation. Not only do the purchases postdate the class period, but they were made by a different investment adviser for different clients and concern only a small piece of Mr. Fox's portfolios. Consequently, they do not undermine Cramer's position as a "typical" class member.

### 4. *Adequacy of Representation*

▇ Finally, we must determine whether Cramer will "fairly and adequately" represent the interests of the Class. Fed.R.Civ.P. 24(a)(4). This "adequacy" requirement encompasses two elements: (a) the class representative must not have interests antagonistic to those of the class, and (b) class counsel must be qualified, experienced, and generally able to conduct the proposed litigation.

---

**10.** Q: Do you believe that the market incorporates the publicly available information about a particular stock?

\* \* \*

Mr. Scher: ... If I didn't believe that, I wouldn't be wasting 100 hours a week doing what I do for the last 12 years.

(Scher Depo., PwC's Compendium at Ex. 1, p. 91.)

*Johnston,* 265 F.3d at 185; *Szczubelek,* at 119–20.

We perceive no conflicts between Cramer and the other class members that would prevent it from fairly representing the interests of the Class. As Cramer notes, all members of the putative class purchased Rent–Way stock during the Class Period. The claims of absent class members arise from the same alleged misconduct and involve the same legal theories as those advanced by Cramer. As the plaintiff with the largest stated loss, Cramer certainly has motivation to aggressively pursue this litigation on behalf of the absentee members. In addition, we have no concerns as to the competency of class counsel in prosecuting this action on behalf of the Class. Thus, we find that the elements of Rule 23(a)(4) are satisfied.

PwC disputes Cramer's claim that it will "fairly and adequately protect the interests of the class," however, based on its claim that Cramer has neither selected its legal counsel nor supervised this litigation, contrary to the mandates of Rule 23(a)(4) and the PSLRA. *See EZRA,* 136 F.Supp.2d at 439 (PSLRA was "enacted to forestall perceived abuses of securities litigation by attorneys having greater financial stakes in the litigation than their clients."). *Accord Berger v. Compaq Computer Corp.,* 257 F.3d 475, 484 (5th Cir. 2001) (noting Congress's "emphatic command" that competent plaintiffs, rather than lawyers, direct complex securities cases under the PSLRA). PwC refers us to Mr. Scher's deposition testimony that it was Cramer's legal counsel—the lawfirm of Gold Bennett Cera & Sidener LLP ("GBCS")—that contacted Cramer and inquired about initiating this litigation and further inquired whether Cramer would be willing to serve as lead plaintiff in this case, not *vise versa.* PwC also makes the claim that Cramer has not actively supervised this litigation.

We are satisfied, however, that Cramer Rosenthal fulfills the criteria of Rule 23(a)(4) as well as the special concerns that arise under the PSLRA. Cramer has presented unrebutted evidence from its legal counsel that GBCS was already representing another client in a suit against Rent–Way at the time it first made contact with Cramer personnel. It was in the course of conducting factual investigation and interviewing other shareholders that GBCS contacted Cramer relative to this alleged securities fraud.[11] (*See* Cera. Supp. Decl. [Doc. No. 116] at ¶ 9 and Ex. H thereto.)

Cramer has also presented unrebutted evidence of its active involvement in this litigation, particularly through its general legal counsel, Elizabeth Coley, Esq. Ms. Coley represents that she has actively participated in the discovery process; she has, for example, assisted in the response of document requests and interrogatories, helped prepare witnesses for deposition, and attended all depositions on behalf of Cramer. In addition, Ms. Coley has conferred with GBCS about important documents and pleadings in the case and has participated in the settlement process. She claims to have been in regular contact with GBCS attorneys to discuss matters relative to this litigation. (*See* Coley Decl. [Doc. No. 118] at ¶¶ (b)-(g).) We find that the evidence of record sufficiently establishes Cramer's interest and involvement in this litigation such that it will fairly and adequately protect the interests of the Class.

*D. Are the Requirements of Rule 23(b)(3) satisfied?*

Rule 23(b)(3) of the Federal Rules of Civil Procedure requires that common issues of fact and law "predominate over any questions affecting only individual members" such that a class action is the "superior method" for achieving a "fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). This requirement "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Weikel v. Tower Semiconductor Ltd.,* 183 F.R.D. 377, 399 (D.N.J.1998) (quoting *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689

---

11. Cramer also points out that the PSLRA requires public solicitation in connection with lead plaintiff proceedings in order that shareholders will be informed of their right to seek appointment as lead plaintiff. *See* 15 U.S.C. § 78u–4(a)(3)(A)(i).

(1997)). In analyzing whether the "predominance" and "superiority" criteria are met, the court considers: (A) the interest of members of the Class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the Class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action. *See* Fed.R.Civ.P. 23(b)(3).

In addition, our Rule 23(b) analysis necessarily involves consideration of the elements of Plaintiffs' cause of action. *See Johnston,* 265 F.3d at 186–87. Thus, in discussing the elements of "predominance" and "superiority," we bear in mind that Plaintiffs' claim under § 10 of the Securities Exchange Act of 1934 and Rule 10b–5 requires proof of: (i) a misstatement or omission of material fact made by the Defendant(s) in connection with Plaintiffs' purchase of Rent–Way stock, (ii) scienter on the part of the Defendant(s), (iii) reasonable reliance by the class member, and (iv) damage resulting from the misrepresentation or omission. *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 173 (3d Cir.2001).

### 1. *Predominance*

 Unlike commonality, the requirement of predominance is a "significantly more demanding" standard, "requiring more than a common claim." *Newton,* 259 F.3d at 187. In securities fraud class actions predicated on a "fraud on the market" theory, there is a presumption that common issues of reliance predominate over any individual issues. *In re Corel Corp. Inc. Sec. Litig.,* 206 F.R.D. 533, 543 (E.D.Pa.2002) (citing *In re Resource America Sec. Litig.,* 202 F.R.D. 177, 188 (E.D.Pa.2001)). However, PwC contends that the "predominance" requirement cannot be met in this case inasmuch as there are numerous issues which will require individualized proof not suitable for class resolution. We address these individually.

### A.

 PwC's first challenge relates to Plaintiffs' proof of PwC's alleged misrepresentations and scienter. PwC contends that, because Cramer's claims against PwC are based on two discrete statements (i.e., its 1998 and 1999 year-end audit opinions), Cramer cannot demonstrate that PwC's alleged misrepresentations and omissions are uniform for all investors who purchased Rent–Way stock during the class period. For example, an investor who bought after the 1998 opinion but before the 1999 opinion will have different proof in terms of establishing the existence of a material misrepresentation or omission in the 1998 opinion than will an investor who purchased stock after the 1999 opinion. Similarly, PwC argues, proof as to its alleged scienter will vary depending on when a particular claimant's purchase occurred. For these reasons, it is urged, Plaintiffs' claims involve individualized issues of proof that are inappropriate for class-wide resolution.

However, courts have frequently certified securities fraud class actions involving a series of alleged false and misleading statements. *See, e.g., In re Honeywell Int'l Inc. Sec. Litig.,* 211 F.R.D. 255, 267 (D.N.J.2002) (citing cases); *In re Resource America Sec. Litig.,* 202 F.R.D. 177 (E.D.Pa.2001); *In re Pharmaprint, Inc. Sec. Litig.,* No. 00–CV–00061, 2002 WL 31056813 (D.N.J. April 17, 2002); *In re Corel Corp. Sec. Litig., supra; Weikel, supra.* The fact that PwC is potentially liable for only its 1998 and 1999 financial statements does not, in the Court's view, present intractable problems of individualized proof. If the need arises, the Court can consider certification of additional sub-classes as a means of redressing any confusion that may otherwise be created by virtue of the disparate financial statements.

PwC's reliance on *J.H. Cohn & Co. v. American Appraisal Assoc., Inc.,* 628 F.2d 994, 998 (7th Cir.1980) is not persuasive. That decision was rendered in the context of the plaintiffs' petition for a writ of mandamus to compel class certification (which had been denied by the district court). The Court of Appeals' review was accordingly circumscribed, as it noted:

An in-depth examination of the propriety of Judge Warren's ruling on the class cer-

tification question is not required. Since all that is at issue is mandamus relief it is sufficient to note that a decision to certify a class action rests in the discretion of the district court, .... and that the district court did not usurp its judicial power or indisputably abuse its discretion in ruling not to certify the class.

628 F.2d at 998 (internal citations omitted). Ultimately, the Court of Appeals denied the requested mandamus relief because the record failed to demonstrate a "clear and indisputable right for the drastic remedy of mandamus." *Id.* at 997. Furthermore, the facts at issue in *J.H. Cohn* are sufficiently distinguishable from those involved here. The alleged misrepresentations at issue in *J.H. Cohn* were contained in "several different oral and written communications issued at various times" during the 33–month class period. *Id* at 998. The allegedly misleading sources at issue here are considerably more limited and, therefore, less apt to create individualized issues of proof. Accordingly, the predominance of issues common to the class is not undermined by the allegedly individualized issues of misrepresentation and scienter.

### B.

■■■ PwC next argues that class certification is inappropriate because of the need for individualized proof with respect to the element of reliance. Normally, an allegation that the defendant perpetrated a fraud on the market entitles the plaintiff to a rebuttable presumption of reliance. *See Newton,* 259 F.3d at 175 ("Reliance may be presumed when a fraudulent misrepresentation or omission impairs the value of a security traded in an efficient market."). PwC claims that Plaintiffs are not entitled to this presumption of reliance because, in PwC's opinion, Cramer has not proven that the theory applies to the case at bar. PwC argues that Cramer has submitted no direct proof that PwC's statements inflated the price of Rent–Way's stock and, therefore, Plaintiffs cannot invoke

the "fraud on the market" theory in support of their claims.

■■■ We are not persuaded by this argument. The "fraud on the market" theory is premised on the notion that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. *See Weikel,* 183 F.R.D. at 387 n. 7. Thus, where a purchaser of a stock demonstrates that he made the purchase in an "open and developed market" and that the defendant made a material misrepresentation, "it 'will [be] presume[d] that the misrepresentations occasioned an increase in the stock's value that, in turn, induced the plaintiffs to purchase the stock.' " *Id.* at 387–88 (quoting *Zlotnick v. TIE Communications,* 836 F.2d 818, 821 (3d Cir.1988)). *See also Newton,* 259 F.3d at 179 ("In fraud-on-the-market cases, the price at which a stock is traded is presumably affected by the fraudulent information, thus injuring every investor who trades in the security."); *Semerenko v. Cendant Corp.,* 223 F.3d 165, 178 (3d Cir.2000) (under the fraud on the market theory of reliance, the court presumes, *inter alia,* that the market price of the security actually incorporated the alleged misrepresentations), *cert. denied sub nom. Forbes v. Semerenko,* 531 U.S. 1149, 121 S.Ct. 1091, 148 L.Ed.2d 965 (2001); *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1419 n. 8 (3d Cir.1997) (Fraud on market theory assumes that "in an efficient market the misinformation directly affects the stock prices at which the investor trades and thus, through the inflated or deflated price, causes injury even in the absence of direct reliance."). Defendants may rebut this presumption by demonstrating, *e.g.,* that the market did not respond to the alleged misrepresentations. *Semerenko,* 223 F.3d at 179. PwC's contention that Plaintiffs must prove, for class certification purposes, that PwC's conduct contributed to the inflation of Rent–Way stock prices places on Plaintiffs the burden to prove an element which they are presently entitled to presume.[12]

---

**12.** PwC contends that Plaintiffs must prove the fact of inflation by measuring the change in the price of Rent–Way stock following disclosure of PwC's allegedly fraudulent statements in its 1998

and 1999 audit opinions. Absent such proof, PwC argues, there is no evidence that this is a "fraud on the market" case. We note, however, that PwC's proposed method is not the exclusive

PwC does not seriously dispute that Rent–Way's stock, which was traded nationally on the New York Stock Exchange, was traded in an open and developed market. *See Freeman v. Laventhol & Horwath,* 915 F.2d 193, 199 (6th Cir.1990) ("it appears that securities traded in national secondary markets such as the New York Stock Exchange ... are well suited for application of fraud on the market theory"); *In re Laidlaw Sec. Litig.,* No. 91–CV–1829, 1992 WL 68341 at *10 n. 8 (E.D.Pa. Mar.31, 1992) ("the fraud on the market theory is particularly applicable to a large national market such as the NYSE"). Moreover, Plaintiffs have adequately alleged material misrepresentations on the part of PwC relative to their purchase of Rent–Way stock during the putative class period.[13] *See In re Rent–Way Securities Litig.,* 209 F.Supp.2d at 511–13. Plaintiffs are therefore entitled to proceed with their theory of fraud on the market.

■■ Having determined that Plaintiffs have properly alleged a "fraud on the market," we conclude that issues of Plaintiffs' reliance will not defeat class certification. Individualized proof of the class members' reliance on PwC's allegedly fraudulent statements becomes unnecessary, since "fraud on the market" allows a presumption that the Plaintiffs Class relied on the alleged misinformation in purchasing Rent–Way stock. *See In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1419 n. 8 ("Plaintiffs using [the fraud on the market] theory need not show that they actually knew of the communication that contained the misrepresentation or omission. Instead, plaintiffs are accorded the presumption of reliance based on the theory that in an efficient market the misinformation directly affects the stock prices at which the investor trades and thus, through the inflated or deflated price, causes injury even in the absence of direct reliance.").

In determining that Plaintiffs are entitled to a presumption of reliance under a "fraud on the market" theory, we are mindful that we are not bound to accept the Plaintiffs' averments at face value and, furthermore, a "preliminary inquiry into the merits" of an action may be warranted which may involve a review of facts obtained through discovery as well as the pleadings. *Newton,* 259 F.3d at 168; *Weikel,* 183 F.R.D. at 387. Here, the record is undeveloped as to the specific effect that PwC's 1998 and 1999 opinions may have had on the price of Rent–Way's stock. However, this is not a reason to deny certification at this time. To require Plaintiffs to present direct proof of their loss at this juncture would be to improperly delve into the merits of the litigation. We find that Plaintiffs' detailed allegations concerning their loss causation theory are sufficient for present purposes to support application of the "fraud on the market" theory and a presumption of reliance. In so finding, we note that the Court retains the power to decertify the class at any time, should a more developed record so warrant.

### C.

■■ PwC next argues that the predominance requirement cannot be met because it is impossible to make a class-wide determination as to whether putative class members suffered any actual damages. According to PwC, individualized issues concerning "fact

method of measuring inflation. As the Ninth Circuit Court of Appeals observed in *Blackie v. Barrack,* 524 F.2d 891 (9th Cir.1975): "The fact finder may rely on other methods of determining actual value on the date of purchase, including expert testimony on actual value derived from capitalization of earnings techniques or testimony on book value." 524 F.2d at 909 n. 25. Moreover, "the drop after a corrective disclosure will not be conclusive of the amount of original inflation, both because the correction may be only partial ... and because the prolonged nature of the fraud introduces other market variables which may affect the amount the market reacted to disclosures at different times during the class period." *Id.*

13. As a result of its accounting improprieties, Rent–Way has attributed adjustments in its pretax operating income in the amount of $21 million as to fiscal year 1999 and $2.3 million as to fiscal year 1998. *See In re Rent–Way Securities Litig.,* 209 F.Supp.2d 493, 497 (W.D.Pa.2002). Plaintiffs allege that PwC falsely reported in its audit opinions for those fiscal years that Rent–Way's financial statements fairly presented its financial condition and results in accordance with Generally Accepted Accounting Principals. That misinformation, it is alleged, contributed to the inflated price of Rent–Way's stock.

of damages" will predominate in this litigation because the proposed class incorporates both: (i) those who purchased and sold Rent–Way stock within the putative class period (i.e., prior to Rent–Way's initial disclosure about its accounting problems) and (ii) those who purchased within the class period but sold after the disclosure of Rent–Way's accounting improprieties. As to the first group, PwC reasons that there are undoubtedly Plaintiffs who, despite the alleged market inflation, did not sell their stock at a loss and, therefore, suffered no injury in fact. Accordingly, it is argued, the finder-of-fact will necessarily have to make individualized determinations as to whether these particular Plaintiffs suffered any economic loss.

The issue is further complicated by the reality that the degree of price inflation on any given day during the class period may well differ from the degree of inflation on a different day during the same period. Where the alleged fraud is of a "prolonged nature," this factor "introduces other market variables which may affect the amount the market reacted to disclosures at different times during the class period." *Blackie v. Barrack,* 524 F.2d 891, 909 n. 25 (9th Cir. 1975). *See also In re California Micro Devices Sec. Litig.,* 965 F.Supp. 1327, 1333 (N.D.Cal.1997) (amount by which stock price was inflated varied depending on content of each misstatement); *In re Cendant Corp. Sec. Litig.,* 109 F.Supp.2d 235, 265 (D.N.J. 2000) (recognizing connection between artificial inflation and the degree to which each earnings statement was overstated). Thus, in this case, where the alleged fraud spans nearly two years and encompasses a multiplicity of allegedly false and misleading statements by various defendants, it may be presumed that the amount of inflation in Rent–Way's stock fluctuated periodically throughout the class period.

Nevertheless, we do not consider this sufficient grounds to defeat a finding of predominance at this juncture. The problems presented by "in and out sellers" are bound to inhere in any securities action alleging a fraud on an open securities market. This is all the more true in cases such as this one where the alleged fraudulent scheme was of

longer duration and/or involved a multiplicity of alleged misrepresentations. To accept PwC's logic and refuse certification because of the existence of "in and out" traders would perhaps establish a precedent that rewards the most egregious violations of § 10(b) by making class certification unattainable.

At present the record is not fully developed as to the issue of how many class members both purchased and sold their Rent–Way stock during the class period. It does appear, however, that the Plaintiffs' case will be predominantly driven by the claims of those class members who sold their Rent–Way stock at substantially reduced prices following the initial disclosure of Rent–Way's accounting improprieties in October of 2000. While there may be putative class members who suffered no actual loss by virtue of their transactions within the class period, it presently appears that these plaintiffs will comprise a comparatively small portion of the class. Moreover, Plaintiffs have satisfied the Court that they will be able to present a workable framework for determining aggregate damages and price inflation at time of trial through the use of expert witnesses who will extrapolate these figures based on trading data during the class period. Therefore, the Court finds for present purposes that common issues as to the class members' injuries predominate over any individual inquiries that may be necessary relative to those who bought and sold within the class period. In so finding, we presume that the parties can flesh out through merits discovery the extent to which pre-disclosure sales are at issue in this litigation and the degree to which proof of injury would necessarily devolve into individualized mini-trials. Based on a more developed record, the Court can consider redefining the class so as to exclude "in and out" traders or, if warranted, decertify the class altogether.

PwC also objects that proof of causation of damages will differ as between those class members who sold before December 2000—when the market first learned of possible material errors in the financial statements audited by PwC—and those who continued to hold, selling after the December 2000 disclosures. We do not view this factor as a

serious roadblock to certification. Any discrepancies in proof occasioned by these two distinct groups will not be so substantial as to overcome the predominance of common liability issues. If necessary, the Court can address these issues through the creation of subclasses.

The Court is cognizant of PwC's reliance on numerous recent decisions from this circuit that discuss the predominance standard. *See Johnston, supra; Newton, supra; In re LifeUSA Holding Inc.,* 242 F.3d 136 (3d Cir. 2001); *Szczubelek, supra.* However, we find these cases to be inapposite to the case at bar.

PwC refers us to *Newton,* wherein the court held that the putative class could not satisfy the predominance standard because their claims would require an economic injury determination for each trade within the class period. 259 F.3d at 190. However, *Newton* is readily distinguishable. In that case, a class of investors sought to hold a group of broker-dealers trading on NASDAQ liable under § 10(b) of the Securities Exchange Act based on the defendants' alleged breach of their duty of best execution. The plaintiffs claimed that the defendants violated their duty to execute trades under the most "favorable terms reasonably available" by executing orders at the price offered on the central National Best Bid and Offer system and failing to investigate other feasible alternatives that potentially offered better prices. Significantly, the claims at issue in *Newton* involved "hundreds of thousands of plaintiffs" and "hundreds of millions of trades" occurring over a four-year period, 259 F.3d at 190, and a determination of whether a class member's trade could have been executed at a better price would require individual analysis into each trade and its alternatives. *Id.* at 188–89. According to the *Newton* Court, these facts were distinguishable from a "fraud on the market" claim where an alleged misrepresentation or omission decreases the value of a security, thereby allowing a presumption of economic loss. *See id.* ("In class actions based on a 'fraud-on-the-market,' . . . the alleged conduct itself causes economic injury."); *id.* at 190 ("[I]n securities cases involving fraud-on-the-mar-

ket . . . injury necessarily flowed from defendant's conduct and reliance and injury could be presumed. In those cases, if defendant's conduct was held fraudulent, a claim of loss naturally followed."). If anything, *Newton* appears to support a finding of predominance in the instant action.

PwC's reliance on *Johnston, LifeUSA,* and *Szczubelek* is similarly unavailing. *Johnston* involved a securities fraud lawsuit in which the stockholders' claims were predicated on alleged oral misrepresentations in the absence of a uniform sales pitch or uniform representations by the defendants. Thus, proof of the defendants' liability would have required individual review of what each investor was told and/or provided in the way of written materials and also would have necessitated individual review of each investor's reliance. 265 F.3d at 189–90. The *Johnston* Court noted that, "as a general rule, an action based substantially on oral rather than written communications is inappropriate for treatment as a class action." *Id.* at 190.

*LifeUSA* involved a group of plaintiffs who had purchased annuity policies under an allegedly fraudulent scheme. The annuities were not sold according to any standard, uniform, or scripted sales presentation, but were sold by independent agents who learned about the annuity from written materials (some of which were not uniform or generated by the defendant) and through voluntary defendant-sponsored seminars. Moreover, these independent agents did not utilize the marketing materials uniformly. 242 F.3d at 146. In fact, the court in *LifeUSA* found that even the relatively relaxed standard of commonality was not met, since the plaintiffs' claims did not arise out of any single event, pattern or practice, but instead arose out of claims allegedly made to over 280,000 purchasers by over 30,000 independent agents without the benefit of uniform or scripted sales presentations. *Id.* at 145–46.

*Szczubelek* involved a suit brought by a putative class of home buyers against a lender and appraisal management service for alleged violations of the New Jersey Consumer Fraud Act. In that case, the district court found that the requirement of predominance was not satisfied because the plaintiff's claim

was based on oral representations by the mortgager's loan representatives, as opposed to written materials, and there was no allegation that putative class members received similar statements. *Szczubelek, supra,* at 121–22. In addition, the court noted the possible existence of class members who suffered no economic loss from the defendants' actions. Following *Newton,* the *Szczubelek* court found the "predominance" requirement unsatisfied because issues concerning "fact of damages" would require individualized treatment. *Id.* at 121–22. However, as we have already pointed out, *Newton* is not only materially distinguishable from the instant case, but it also supports certification in "fraud on the market" cases where "fact of injury" can be presumed.

In sum, we are not persuaded that individualized issues of damages preclude certification in this case.

**D.**

Finally, PwC contests "predominance" on the ground that proportionate liability cannot be determined on a class-wide basis. According to PwC, its proportionate liability would have to be separately determined for different members of the class depending on when they purchased their shares.

In enacting the PSLRA, Congress specifically directed that a jury answer special interrogatories to address this issue. *See* 15 U.S.C. § 78u–4(f)(3) (West.Supp.2003). We agree with Cramer that, contrary to PwC's interpretation, the statute's express reference to class actions, § 78u–4(a)(1), evidences Congress's intent that proportionate liability findings be premised upon a defendant's class-wide share of liability, rather than its exposure to individual class members. We further agree that, if PwC's position is to be accepted, then class actions in multi-defendant securities litigation would effectively be eviscerated. Accordingly, we reject this argument in opposition to class certification.

**2. *Superiority***

 In assessing whether a class action is a superior method of adjudication, we must balance the fairness and efficiency of the class action against other alternative forms of resolution, such as individual lawsuits or consolidation. *In re Corel Corp. Inc. Sec. Litig.,* 206 F.R.D. at 544. We find the class action to be the superior method of adjudicating this matter for several reasons. Absent class resolution, this Court could theoretically be faced with at least hundreds of lawsuits arising out of the Defendants' alleged misconduct. We agree with Cramer that litigating this dispute as a class action will promote the efficient use of judicial resources. Moreover, there appears to be little, if any, interest on the part of class members in individually controlling this litigation. Indeed, were class certification denied, it would likely be the death-knell of most Plaintiffs' claims, as the cost of individual litigation would be prohibitive vis-a-vis the potential recoveries. The Court is not presently aware of any significant litigation, apart from the instant case, arising out of these matters. Further, there is certainly an interest in concentrating all Rent–Way securities litigation in this forum, as much of the evidence, and many of the witnesses, relevant to this litigation are located in this district. Nor do we perceive any significant or unusual difficulties that would interfere with the management of a class action. Citing *Newton, Johnston,* and *LifeUSA,* PwC asserts that a trial of this action would be unmanageable and would likely devolve into numerous mini-trials. As discussed, *supra,* those cases are materially distinguishable from this case and therefore not persuasive as a basis to deny certification here. Moreover, we have already addressed and rejected PwC's arguments as to why individualized proof will predominate with respect to issues of fact-of-damages, reliance, and proportionate liability. We need not repeat that discussion here. Should future developments prove us wrong, the Court retains discretion to modify or decertify the class.

**IV. CONCLUSION**

For all of the reasons discussed above, we find that the elements of Rule 23(a) and (b) are satisfied. Accordingly, we will grant Cramer's motion for class certification and allow it to serve as Class Representative in this case.

### ORDER

AND NOW, this _____ day of September, 2003, for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Lead Plaintiff's Motion [Doc. No. 96] for Class Certification is GRANTED. IT IS FURTHER ORDERED that Lead Plaintiff Cramer Rosenthal McGlynn, LLC is appointed to serve as Class Representative.